## No. 14-1206

# United States Court of Appeals
# for the Fourth Circuit

WU TIEN LI-SHOU,

*Plaintiff-Appellant,*

*v.*

UNITED STATES OF AMERICA,

*Defendant-Appellee.*

*On Appeal from the United States District Court for District of Maryland at Baltimore in No.1:13-CV-01366 (Hon. Frederick Motz, Senior U.S. District Judge)*

## BRIEF FOR APPELLANT

TIMOTHY B. SHEA
NEMIROW, HU & SHEA
1900 L Street, NW, Suite 303
Washington, DC 20036
(202) 835-0300
timbshea@gmail.com

THOMAS G. CORCORAN, JR.
BERLINER,CORCORAN
 & ROWE, LLP
1101 17th Street, NW, Suite 1100
Washington, DC 20036-4798
(202) 293-5555
tgc@bcr-dc.com

*Counsel for Appellant*

May 28, 2014



# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

No. <u>14-1206</u> Caption: <u>Wu Tien Li-Shou v. United States of America</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,
<u>Wu Tien Li-Shou</u>     who is <u>  Appellant  </u>, makes the following disclosure:
  (name of party/amicus)      (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?
      ( ) YES                 ( X ) NO

2.    Does party/amicus have any parent corporations?
      ( )    YES               ( X ) NO
    If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
      ( ) YES                 ( X ) NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
      ( ) YES                 ( X ) NO
    If yes, identify entity and nature of interest:

5.    Is party a trade association (amici curiae do not complete this question)?
      ( ) YES                 ( X ) NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?
      ( ) YES                 ( X ) NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: <u>/s/ Timothy B. Shea</u>        Date: <u> May 28, 2014  </u>
          Counsel for Appellee

i

# **TABLE OF CONTENTS**

*Page*

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS ................................................................................................i

TABLE OF AUTHORITIES ....................................................................iv

I.    STATEMENT OF APPELLATE AND SUBJECT MATTER JURISDICTION ........................................................................1

II.   STATEMENT OF ISSUES PRESENTED FOR REVIEW ..........................1

III.  STATEMENT OF THE CASE ....................................................................2

IV.   SUMMARY OF THE ARGUMENT ................................................................8

V.    ARGUMENT ........................................................................................12

    A. Standard of Review .................................................................12

    B. Discussion of Issues .................................................................14

        1. The District Court Clearly Erred in Dismissing the Complaint based on Political Question Doctrine ..................................14

            a. The Characterization of this Police Action against the Somalis as a Belligerency was Premature and Unsupported. ........15

            b. The Court's Dismissal of Interests of Shipowners in Recovery for Vessel Damages under Admiralty Precedent Constituted Manifest Error. ...........................................23

                (i) The Court's suggestion that the PVA is limited to errors of navigation was erroneous. ...........................................23

                (ii) The District Court's justification for Dismissal of the Vessel Damages claim based on unexamined suggestion of differing standard of separation of powers for *in rem* cases was erroneous. ...........................................27

2.  The Discretionary Function Doctrine has no Application to this case because the Navy Destruction of the JCT 68 was Contrary to Law and Unauthorized -- Arguments that Parties Never had the Opportunity to make......................................................30

    a.  Acts Contrary to Law or Beyond Lawful Discretion of Actor are outside the protection of the Discretionary Function Exception.........................................................................31

    b.  Courts, not the Executive, Decide Action to be taken with regard to a Vessel Recaptured from Pirates under U.S. and International Law. ....................................................32

3.  The PVA specifically contemplated judicial review of the actions of Navy vessels on the High Seas and Crafted Judicial Measures to control discovery against Military Commanders; therefore, Routine Application of the First two Prongs of *Baker* here was error. .................................................................37

    a.  The PVA was a Wartime Measure Intended to broadly waive Sovereign Immunity as to U.S. Navy vessels with Specific Mechanisms for Discovery against Military Commanders............................................................................37

    b.  Routine application of *Baker v. Carr* factors to PVA would eviscerate the PVA and undermine the line of decisions under the PVA. .....................................................39

VI.   CONCLUSION AND RELIEF SOUGHT ...................................41

VII.  REQUEST FOR ORAL ARGUMENT .......................................41

CERTIFICATE OF COMPLIANCE.......................................................42

CERTIFICATE OF SERVICE ............................................................43

iii

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Aktepe v. United States*,
105 F.3d 1400 (11th Cir. 1997) ...........................................................22

*Al Shimari v. CACI International, Inc.*,
658 F.3d 413 (4th Cir. 2011) ..............................................................23

*B & F Trawlers, Inc. v. United States,*
841 F.2d 626 (5th Cir. 1988) ...............................................32, 36, 40

*Baker v. Carr*,
369 U.S. 186 (1962)..........................2, 3, 8, 11, 15, 16, 17, 21, 30, 37, 39, 40, 41

*Bank Line v. United States*,
163 F.2d 133 (2nd Cir. 1947)...............................................................39

*Berkovitz v. United States*,
486 U.S. 531 (1988)..............................................................................31

*Bolchos v. Darrel*,
3 F. Cas. 810, (No. 1,607) (SC 1795) ................................................27

*Canadian Aviator, Ltd. v. United States*,
324 U.S. 215 (1945)....................................................................23, 24

*Collins v. United States*,
783 F.2d 1225 (5th Cir. 1986) ............................................................36

*Cooksey v. Futrell*,
721 F.3d 226 (4th Cir. 2013) ..............................................................12

*Cranford v. United States*,
466 F.3d 955 (11th Cir. 2006) ...........................................................40

*Dalehite v. United States*,
346 U.S. 15 (1953)................................................................................32

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988)..............................................................................40

iv

*Dooley v. United States,*
    182 U.S. 222 (1901) ...................................................................33

*El-Shifa Pharmaceutical Industries Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2009) ...................................................22

*Evans v. B.F. Perkins Co.,*
    166 F.3d 642 (4th Cir. 1999) .....................................................12

*Feres v. United States,*
    340 U.S. 135 (1950) ...................................................................22

*Gibbs v. United States,*
    94 F. Supp. 586 (N.D. Cal. 1950) .............................................26

*Ira S. Bushey & Sons, Inc. v. United States,*
    398 F.2d 167 (2nd Cir. 1968).....................................................26

*Jecker v. Montgomery,*
    54 U.S. 498 (1852).....................................................................28

*K. W. Thompson Tool Co. v. United States,*
    836 F.2d 721 (1st Cir. 1988) .....................................................32

*Kerns v. United States,*
    585 F.3d 187 (4th Cir. 2009) ..................................... 13, 14, 17, 31, 36

*Koohi v. United States,*
    976 F.2d 1328 (9th Cir. 1992) ...................................................40

*L'Invincible,*
    14 U.S. 1, 1 Wheat 238 (1816) ..................................................28

*Lebron v. Rumsfeld,*
    670 F.3d 540 (4th Cir. 2012) .....................................................15

*Lind v. United States,*
    156 F.2d 231 (2d Cir. 1946)................................................. 23, 26

*Marbury v. Madison,*
    5 U.S. (1 Cranch) 137 (1803)....................................................15

*McMellon v. United States*,
387 F.3d 329 (4th Cir. 2004) (*en banc*) ........................................... 10, 16, 30, 37

*Medina v. United States*,
259 F.3d 220 (4th Cir. 2001) ................................................................31

*Miller v. The RESOLUTION*,
2 U.S. 1 (1781) ......................................................................................28

*Moxon v. The Fanny*,
17 F. Cas. 942 (No. 9,895) (Pa 1793) ..................................................27

*Murray v. The CHARMING BETSY*,
6 U.S. 64 (1804) ....................................................................................28

*Nurse v. United States*,
226 F.3d 996 (9th Cir. 2000) ................................................................32

*Ocean S.S. Co. v. United States*,
38 F.2d 782 (2nd Cir. 1930) ................................................................26

*Pacific-Atlantic S.S. Co v. United States*,
175 F.2d 632 (4th Cir. 1949) ................................................................23

*Red Lake Band of Chippewa Indians v. United States*,
800 F.2d 1187 (D.C. Cir. 1986) ..........................................................32

*Richmond, Fredericksburg & Potomac R. Co. v. United States*,
945 F.2d 765 (4th Cir 1991) ................................................................13

*SANTISSMA TRINIDAD*,
20 U.S. 283 (1822) ................................................................................28

*Scheuer v. Rhodes*,
416 U.S. 232 (1974) ..............................................................................12

*Scrimgeour v. Internal Revenue*,
149 F.3d 318 (4th Cir. 1998) ................................................................13

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) ..............................................................18, 27, 28

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002) ...................................................................12

*Taylor v. Kellogg Brown & Root Servs., Inc.,*
    658 F.3d 402 (4th Cir. 2011) ............................................ 16, 22

*Thames Shipyard & Repair Co. v. United States,*
    350 F.3d 247 (1st Cir. 2003) ...................................................40

*The JOSEFA SEGUNDA,*
    18 U.S. 338 (1820) ....................................................................35

*The PALMYRA,*
    25 U.S. 1 (1827) ........................................................................28

*Tiffany v. Unites States,*
    931 F.3d 271 (4th Cir. 1991) ...................................................22

*Tobar v. United States,*
    731 F.3d 938 (9th Cir. 2013) ...................................................40

*United States Fid. & Guar. Co. v. United States,*
    837 F.2d 116 (3d Cir. 1988)......................................................32

*United States v. Alaska,*
    503 U.S. 569 (1992)...................................................................33

*United States v. Alvarez-Machain,*
    504 U.S. 655 (1992)...................................................................28

*United States v. Dire,*
    680 F.3d 446 (4th Cir. 2012) ............................................ 18, 33

*United States v. Hasan,*
    747 F. Supp. 2d 599 (E.D. Va. 2010) ......................................33

*United States v. The Australia Star: The Hindoo,*
    172 F.2d 472 (2nd Cir. 1949)...................................................26

*United States. v. The Ambrose Light,*
    25 Fed. 408 (D.C. Cir. 1885) ...................................................18

vii

*United States v. Varig Airlines*,
   467 U.S. 797 (1984) ................................................................. 32, 36

*Velasco v. Gov't of Indonesia*,
   370 F.3d 392 (4th Cir. 2004) .............................................. 13

*Vieth v. Jubelirer*,
   541 U.S. 267 (2007) .............................................................. 16

*Weyerhaeuser S.S. Co. v. United States*,
   372 U.S. 597 (1963) .............................................................. 24

*Zivotofsky v. Clinton*,
   132 S. Ct. 1421 (2012) ........................................................ 40

## Statutes

10 U.S.C. § 948a ..................................................................... 18

28 U.S.C. § 1291 ...................................................................... 1

28 U.S.C. § 1333 ...................................................................... 1

28 U.S.C. § 2680(j) .................................................................. 23

46 U.S.C. §§ 30301 *et seq.*....................................................... 1

46 U.S.C. §§ 30901 *et seq.* .......................................... 1, 2, 37

46 U.S.C. §§ 31101, *et seq.*............................................ 1, 2, 9

13 U. S. T. 2312, T. I. A. S. No. 5200 (April 29, 1958) ................. 18, 32

Shipping Act of 1916, 39 Stat. 728 *et seq.* ................................. 37

## Rules

Fed. R. Civ. P. 12(b)(1)....................................................... 12, 13

## Constitutional Provisions

U.S, Const., Article III, section 2 cl. 1 ...................................1, 3

## Other Authorities

"Policy for the Repression of Piracy and Other Criminal
Acts of Violence at Sea"; Statement of President George W. Bush...................19

26 Am. J. Int'l L. 743 (1932)......................................................................33

3 Op. Atty. Gen. 377 (1838) .......................................................................34

43 Stat. 1112 .............................................................................................38

58 Stat. 723 - 726 ......................................................................................38

58 Stat. 724 - 725 (1944) ...........................................................................39

Brownlie, I, *Principles of Public International Law,* (Sixth Ed. 2003) ................34

Geneva Convention on the High Seas (1958)..................................... 18, 19, 32, 33

H.R. Rep. No. 68 – 913 at 15 (1924). .........................................................38

Op. Att'y Gen. 57 (1795).............................................................................28

Op. Atty. Gen. 584 (1822............................................................................34

*Restatement, 1st of Restitution*, § 128.........................................................35

*Restatement, 2d of Torts*, § 927 ................................................................29

*The Commander's Handbook on Law of Naval Operations,*
Annotated Supplement (1997 Ed.)................................................................34

United Nations Convention on the Law of the Sea (1982)........................ 19, 20, 33

United Nations Resolution 1976 dated April 11, 2011...........................................19

Wheaton, H., *A Digest of the Law of Maritime Captures
and Prizes* (McDermut 1815) ...................................................................35

Woolsey, T.W., *Introduction to the Study of
International Law* (Sixth Ed. 1891)................................................................35

## I.    STATEMENT OF APPELLATE AND SUBJECT MATTER JURISDICTION

The district court had subject matter jurisdiction over this action under 28 U.S.C. § 1333, 46 U.S.C. 30301 *et seq*., 46 U.S.C. §§ 30901 *et seq*., 46 U.S.C. §§31101, *et seq.,* Article III, section 2 cl. 1 of the Constitution of the United States ("all cases of admiralty and maritime jurisdiction") and general admiralty and maritime jurisdiction of the court.

Appellate jurisdiction is lodged with this court under 28 U.S.C. §1291.

This appeal is timely as Appellant Wu Tien Li-Shou noted her appeal on March 5, 2014, less than 60 days after January 31, 2014, the date of the entry of the final order dismissing the Complaint. Rule 4(a)(1)(B)(i), *F.R.A.P.*

## II.    STATEMENT OF ISSUES PRESENTED FOR REVIEW

The issues presented for appeal are:

1. Did the District Court err in deciding political question justiciability issues under the Government motion to dismiss without discovery, evidentiary hearings, or detailed analysis of the actions, governing instructions, law, rules and alternatives at issue?

2. Did the court clearly err in: characterizing the initial approach of the SWG to the JCT 68 as a belligerency, rather than a law enforcement action; and in supplying a rationale for the destruction of the JCT 68 unsupported by any facts (distraction of law enforcement resources associated with bringing JCT 68 to port) and ignoring the stated reason (hazard to navigation) for the action?

3.  Did the Court mischaracterize the governing maritime precedent as to recovery by shipowners for damages by limiting the Public Vessels Act to errors of navigation; ignoring consideration of the Circuit's Good Samaritan doctrine; and finding that *rem* actions had a different standard of justiciability?

4.  Did the District Court apply the proper standard for political question justiciability for a Public Vessels Act claim where the two primary elements of the *Baker v. Carr* factors, military involvement and discovery sought against Navy commanders, which are typical of Public Vessels Act cases, were specifically contemplated by Congress in the measure?

## III.    STATEMENT OF THE CASE

*Procedural History.* Appellant, Wu Tien Li-Shou, the wife and legal representative of a shipowner killed by the United States Navy vessel the *USS Steven W. Groves* and whose fishing vessel later was sunk deliberately by the *USS Steven W. Groves*, filed a complaint seeking damages for loss of life, pain and suffering and the value of the vessel and enterprise the vessel represented.   The fishing vessel, JIN CHUN TSAI 68 ("the *JCT 68*"), at the time was under the control of Somalis who had pirated it. The *USS Steven W. Groves* in a police action sought to stop the *JCT 68* and liberate the vessel and its crew. Appendix at 4 -8 ("A4-8"). The Complaint noted that Appellant Wu duly exhausted her administrative remedies with an administrative claim.  A10.

The Complaint filed on May 9, 2013 was brought under the Death on the High Seas Act, 46 U.S.C. §§ 30301 *et seq*., the Suits in Admiralty Act, 46 U.S.C. §§ 30901 *et seq*.("SIAA"), the Public Vessels Act, 46 U.S.C. §§31101, *et seq*.,

2

Article III, section 2 of the Constitution of the United States and the general

maritime jurisdiction of the court as the events at issue took place on the high seas.

A2, 4.

United States moved to dismiss for lack of jurisdiction based on the political

question doctrine citing *Baker v. Carr*, 369 U.S. 186 (1962). A2.

After Appellant duly opposed the Government motion, oral argument on

October 25, 2013, and supplemental briefing by each side, the District Court

granted the Government motion and dismissed the Complaint based on the political

question doctrine in a Memorandum and Order filed on January 31, 2013, later

amended on February 4, 2013. A2.

Appellant noted her appeal to this court on March 5, 2014. A3.

*Facts.* Summarizing, the Navy vessel, *USS Stephen W. Groves* ("*SWG*"), a

453 foot frigate with a crew of over 200 equipped with essentially every armament

available to the U.S. Navy, precipitated a surprise approach on a fishing boat under

the command of suspected pirates equipped with small arms. Unmistakable

evidence even from the Navy after action investigation demonstrates that the on-

site commander conspicuously failed to take reasonable measures to protect the

lives and property of innocent hostages by, for example, using exploding ordinance

on the fishing boat rather than inert ordnance and firing into central compartments

rather than at the skiffs on the bow or the boat's engines. Innocents, including

Appellant's husband, Master Wu, paid the price with their lives. Even after all of suspected pirates had surrendered and with the fishing boat floating safely alongside the *SWG* for more than a day, the naval commander ordered the fishing boat to be sunk without any consideration of the rights of the boat owners or the remains of Master Wu. A5- 10.

In early March, 2010 the *JCT 68,* which plied the Pacific and Indian Oceans for fish, was taken over by Somalis in the Indian Ocean. A5.

In May 2011 the *SWG*, operating in the Gulf of Aden in partnership with certain NATO activities, formed a plan to stalk the *JCT 68*. The U.S. Navy chain of command maintained control of the *SWG* operations at all times. A6. The U.S. chain of command through Destroyer Squadron 2 advised *SWG* against the use of disabling fire with respect to the JCT 68 because of the risk to civilians on board. A6. When the *SWG* initiated contact with the JCT 68, the *SWG* enjoyed complete freedom of action with respect to the *JCT 68*. At no time did the *JCT 68* seek to initiate a threat to the *SWG*. A6.

On May 9, 2011, the *SWG* adopted a plan to rescue Master Wu and his crew under which the *SWG* would first give verbal warnings to the *JCT 68* and then, as necessary, follow-up with bracketing fire to pacify the suspected pirates aboard. U.S. Navy instructions on engagement of suspected pirate vessels mandated notice of the Navy intentions followed by incremental non-disabling fire. These

4

instructions made consideration of the welfare of innocents aboard the vessels to be paramount.  A separate protocol with separate warnings were required before use of disabling fire was authorized and such fire was required to be limited to stern engines, not passenger accommodations. A6.

*SWG* initiated its contact with the *JCT 68* at 2:16 in the morning, local time. After giving  verbal warnings via the VHF radio to the *JCT 68* in English and Somali, but not Chinese Mandarin, and flashing lights and blowing whistles for several minutes, the *SWG* fired warning shots forward of the *JCT 68's* bow and gave additional verbal warnings via VHF radio. A6.

After *SWG* positioned itself 1000 yards away from the JCT 68's starboard beam, it fired machine guns in the direction of the *JCT 68*, intending to strike forward of the boat and then intending to deliberately walk the fire onto the skiffs resting on the bow of the *JCT 68*. Rather than striking forward of the *JCT 68*, some of the fire hit the vessel on the starboard side amidships, well aft of the bow. The *SWG* did not pause at that point to assess the damage done to the *JCT 68* or to the reaction of the suspected pirates to the fire. Instead, undeterred by the first firing error, the *SWG* fired more rounds of machine gun fire on the *JCT 68*. The *SWG* then moved 1400 yards away from the *JCT 68*. At 3:09 AM the *SWG* fired more machine gun rounds on the *JCT 68* purportedly aimed at the skiffs on the boat's

bow. U.S. Navy instructions explicitly forbade disabling fire on the bow of a suspected pirate vessel to avoid injury to innocent victims. A7.

At that point the suspected pirates assembled on the ship's bow indicating a willingness to surrender. The *SWG* crew directed the pirates and two unharmed crewman of the *JCT 68* to debark the *JCT 68* into one of the *SWG*'s launches. The *SWG*'s boarding crew boarded the *JCT 68* where it discovered four dead, Master Wu as well as three suspected pirates. In addition, the crew discovered two suspected pirates injured from gunfire. Master Wu was found in his sleeping quarters amidships with the crown of his head removed by the *SWG*'s gunfire. Two other dead were found forward of the pilot house. A7, A67. There is no dispute that the government gunfire struck and killed master Wu in his sleeping quarters. A96.

After taking Master Wu's remains on the *SWG*, the next day the *SWG* crew returned the remains to the JCT 68. After a short burial service, the SWG fired upon the *JCT 68* using close in weapon systems sinking the *JCT 68* with Master Wu's body on board. A7, A67.

The SWG made no assessment of the seaworthiness of the *JCT 68* after the surrender of the pirates. The *SWG* did not seek nor did it obtain authorization for firing upon Master Wu's remains or the *JCT 68*. The *JCT 68* was, in fact, seaworthy after the surrender of the pirates. At that point the *JCT 68* was no longer

in possession of pirates so the Navy had no authority to command the *JCT 68*. The *SWG* ignored the appeals of the surviving JCT 68 crew members that the vessel be towed back to shore or that they may be allowed to navigate the vessel. No customary notice, request or permission to the owners or flag state of registry, Republic of China (Taipei), was provided. A8, 9.

The decision to sink the *JCT 68* was unauthorized and irrational. A8, 9.

The *SWG* later set the suspected pirates free without ever arranging for any trial or other judicial proceedings. A8.

A Navy investigation of the incident, a copy of which was attached to the Government Motion to Dismiss, A62 *et seq*., concluded that the *SWG* violated a score of specific directives and laws in this approach and that these violations led to the fatal injury of Master Wu, his crew, and the loss of the boat. [1] A8 -9.

---

[1] The violations included: the *SWG* wrongly employed high explosive rounds rather than inert ordinance; the use of an anti-aircraft gatling gun against a small vessel was starkly disproportionate; the range of engagement made observation of the *JCT 68* difficult, particularly the essential ability to discern people on board; the *SWG* failed to provide any advance notice to the *JCT 68's* vessel registry authorities or to the Government of the Republic of China (Taiwan) of its aggressive intentions and to learn of the status of any negotiations as to freeing the vessel and Master Wu; the *SWG* failed to take into account the risk to people aboard the *JCT 68* contrary to Navy rules; and the *SWG* failed to contact *JCT 68's* vessel registry authorities and Republic of China (Taiwan) authorities immediately after the engagement to permit salvors or commercial surveyors to recover and preserve the *JCT 68*. A9. The U.S. Navy investigation found that the *SWG* violated a number of tactical instructions, e.g., failed to specifically warn the *JCT 68* which portions of the boat were going to be targeted with fire; employment of 25 mm high explosive rounds vice inert ordinance; and adoption of a range of fire that made observation of people on the *SWG* difficult. A72 -73

Appellant in her opposition to the motion to dismiss and supplemental

memorandum challenged certain characterizations of the facts in the Government

submissions and sought discovery and an evidentiary hearing on such issues (e.g.,

that the naval commander complied with the rules of engagement; that U.S. law or

Navy doctrine authorized destruction of recaptured vessels; that the *SWG* was ever

at risk from fire from the *JCT 68*; that the NATO command to the *SWG* could

override international or U.S. law; that the *JCT 68* was or could have been a hazard

to navigation; and that the *SWG* had a duty to assess alternatives to destruction of

the *JCT 68* and had failed to contact salvors or flag state authorities). A7-9; A89 –

91.

*Ruling Presented for Review.* The ruling presented for review is the

Memorandum and Order dated January 31, 2014, amended on February 4, 2014,

dismissing the Complaint. A127 *et seq.*

## IV.    SUMMARY OF THE ARGUMENT

1.  The law is settled that if the defendant challenges a factual predicate of

subject matter jurisdiction, a trial court may evaluate the allegations of the

complaint in an evidentiary hearing to determine any facts to support the

jurisdictional allegations. The District Court pretermitted discovery and evidentiary

hearings and failed to make the requisite or, indeed, any specific findings in

support of the claim of political question nonjusticiability as required under *Baker*

*v. Carr* to connect the doctrine to the particular facts. Absent such discovery, hearings and findings, the application of doctrine would eviscerate the particularly broad waiver of sovereign immunity in the Public Vessels Act, 46 U.S.C. §§31101, *et seq*. ("PVA").

2.  The District Court also clearly misconstrued even the one sided record before it. No belligerency took place as there was no war or conflict of a legally recognized belligerent state. The characterization of the first day encounter between *SWG* and the *JCT 68* as "a belligerent operation" without the benefit of discovery or evidentiary hearings constituted clear error.

Worse, the District Court supplied an altogether new rationale for the destruction of the *JCT 68* never expressed by the Navy: that failing to destroy the JCT 68 would have caused *SWG* to "travel thousands of miles away from the counter piracy theater thereby reducing the assets available for the antipiracy operation." A130. The Navy's stated rationale, "hazard to navigation", A67, a perfectly ordinary administrative determination wholly removed from any claim of belligerency or special political sensitivity, was never even acknowledged by the District Court. Nor did the court entertain discovery or hearings relating to alternatives available to the Navy, e.g., use of the surviving crew to navigate the *JCT 68*, marine salvors, or recourse to the vessel flag state authorities.

9

The Memorandum therefore combines egregious error on a motion to dismiss: the court engaged in fact finding without discovery or an evidentiary hearing; and the facts found were at odds with the fragmentary record as it was.

3.  The District Court misread applicable admiralty law. The District Court ignored  this Court's formulation of the Good Samaritan doctrine wherein, a rescuer, such as the U.S. Coast Guard or Navy, may be liable if it increased the risk to the victim over what it would have been had it not engaged in the undertaking at all. Here, the Navy directly caused the harm so there is little doubt that Appellant can satisfy that test. That the stop and rescue mission of the *SWG* had all the incidents of an ordinary law enforcement action at sea is evidenced by the specific law enforcement statements of the anti-piracy authorities relied upon by the Government.

A footnote of the Memorandum  dooming the Complaint as "futile" on the basis that the discretionary function exception read into the SIAA by *McMellon v. United States*, 387 F.3d 329, 349 (4th Cir. 2004) (*en banc*) protected the gunfire of the SWG, A129, disposed of the entire case through an issue that had not been briefed.  In fact, the PVA is the predominant jurisdictional statute as to Navy vessel activities. Even assuming that the PVA were deemed to have an exception for discretionary functions in this Circuit, it would not shelter the Navy from liability for the acts alleged in the Complaint. The discretionary function exception,

10

which is limited to actions within the genuine authority of the Government actor, cannot protect the summary disposition of a pirated vessel because under longstanding U.S. and international law, the courts, not the Executive, are responsible for determining the disposition of such vessels.

4.  Finally, the Court applied an erroneous legal test of political justiciability under *Baker*. Routine application of a *Baker* presumption against review of military activities eviscerates the central purpose of the Legislative branch and the Executive in crafting the waiver of immunity in the PVA. After all, the PVA was a wartime measure waiving liability as to Navy vessels with specially crafted evidentiary rules to deal with discovery against Navy commanders. Thus, because the first two, and the most important, *Baker* criteria were addressed by the Congress and the Executive in the law, these two factors cannot be used to sustain a finding of political question non-justiciability without undermining the established intentions of the PVA.  A finding of political question nonjusticiability under the PVA, therefore, must be based on factors not addressed in the PVA itself, which the Court did not do.

Accordingly, the dismissal must be set aside and the case remanded to the District Court for further proceedings.

## V.  ARGUMENT

### A. Standard of Review

*Standard of Review.* Pre-discovery motions for dismissal or summary judgment are generally disfavored.  *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002); *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974) ("When a  federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."). "The district court should grant the Rule 12(b)(1) motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999) (citations and quotation marks omitted). This Court reviews *de novo* a district court's decision on a motion to dismiss for lack of subject matter jurisdiction. *Cooksey v. Futrell*, 721 F.3d 226, 234 (4th Cir. 2013).

In a challenge to subject matter jurisdiction with a Rule 12(b)(1), Fed. R. Civ. P. motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Velasco v. Gov't of*

*Indonesia,* 370 F.3d 392, 398 (4th Cir. 2004); *Richmond, Fredericksburg &*

*Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir 1991). "We review

the district court's factual findings with respect to jurisdiction for clear error and

the legal conclusion that flows therefrom *de novo*." *Velasco v. Gov't of Indonesia*,

*supra* at 398. A finding is clearly erroneous if "the reviewing court on the entire

evidence is left with the definite and firm conviction that a mistake has been

committed." *Scrimgeour v. Internal Revenue*, 149 F.3d 318, 324 (4th Cir.

1998)(citations and internal quotations omitted).

In a Rule 12(b)(1) motion, a defendant may contend that a complaint is

facially defective, that is, that it fails to allege facts upon which subject matter

jurisdiction can be based. On a facial attack, the court  "assume[s]the truthfulness

of the facts alleged." *Kerns v. United States,* 585 F.3d 187, 193 (4th Cir. 2009).

Alternatively, if the defendant challenges the factual predicate of subject matter

jurisdiction, a trial court may then go beyond the allegations of the complaint "in

an evidentiary hearing" to determine facts to support the jurisdictional allegations.

*Id.*(when the scope-of-employment issue is determinative of both jurisdiction and

the underlying merits of a FTCA claim, dismissal under Rule 12(b)(1) without

discovery is error).

> [W]here the jurisdictional facts are intertwined with the facts
> central to the merits of the dispute, a presumption  of
> truthfulness should attach to the plaintiff's allegations.  In that
> situation, the defendant has challenged not only the court's

13

jurisdiction but also the existence of the plaintiff's cause of action. A trial court should then afford the plaintiff the procedural safeguards -- such as discovery -- that would apply were the plaintiff facing a direct attack on the merits. …

[W]hen the defendant challenges the veracity of the facts underpinning subject matter jurisdiction, the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts. And when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery, unless the jurisdictional allegations are clearly immaterial or wholly unsubstantial and frivolous.

*Kerns v. United States, supra* at 193 (citations and internal quotations omitted).

## B. Discussion of Issues

### 1. The District Court Clearly Erred in Dismissing the Complaint based on Political Question Doctrine

The District Court finding that the entire incident constituted a "belligerency" as to which the first prong of the political question doctrine, "a textually demonstrable constitutional commitment of the issue to a coordinate political department," applied was premature without discovery and an evidentiary hearing, clearly erroneous and based on a flawed legal standard.  The Court made no effort to tether the facts to specifically nonjusticiable issues. The Court's treatment of admiralty claims under the PVA fundamentally misapprehended the law.

The bare rationale that the "conducting of a belligerent operation is entrusted by the Constitution to the executive branch of government, subject to review by the legislative branch of government" and would "require this court to review the conducting of such an operation," A129, was both premature and erroneous.

As to the deliberate destruction of the *JCT 68* well after the boarding and removal of the Somalis, the court rationale that "the political question doctrine still applies," A129, because the *SWG* could not afford the time to accompany the *JCT 68* to port, with no basis in the Complaint or Navy report, was indefensible.

### a. The Characterization of this Police Action against the Somalis as a Belligerency was Premature and Unsupported.

This court summarized the political question doctrine recently.

> A claim presents a political question when the responsibility for resolving it belongs to the legislative or executive branches rather than to the judiciary. See *Baker v. Carr*, 369 U.S. 186, 210 (1962) ("The nonjusticiability of a political question is primarily a function of the separation of powers."). The political question doctrine prevents the courts from encroaching on issues that the Constitution assigns to these other branches or that the judiciary is ill-equipped to decide. See id. at 217. However, in determining whether the questions that this case presents belong to another branch of government, we remain mindful of the fact that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803).

> "[M]ost military decisions lie solely within the purview of the executive branch." *Taylor*, 658 F.3d at 407 n.9. As this Court explained in *Lebron v. Rumsfeld*, 670 F.3d 540 (4th Cir. 2012), "the Constitution delegates authority over military affairs to Congress and to the President as Commander in Chief. It

15

contemplates no comparable role for the judiciary. . . . [J]udicial review of military decisions would stray from the traditional subjects of judicial competence." *Id*. at 548. However, "acting under orders of the military does not, in and of itself, insulate the claim from judicial review." *Taylor [v. Kellogg Brown & Root Servs., Inc.,* 658 F.3d 402, 411]*. Therefore, although cases involving military decision making often fall in the political question box, we cannot categorize such a case as nonjusticiable without delving into the circumstances at issue.

The Supreme Court announced a six-factor test for assessing whether a claim poses a political question in *Baker v. Carr*. Pursuant to Baker, cases involving political questions evince (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department," (2) "a lack of judicially discoverable and manageable standards for resolving" the issue, (3) "the impossibility of deciding [the issue] without an initial policy determination of a kind clearly for nonjudicial discretion," (4) "the impossibility of a court's undertaking independent resolution [of the issue] without expressing lack of the respect due coordinate branches of government," (5) an "unusual need for unquestioning adherence to a political decision already made," or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id*. at 217.

*Metzgar v. KBR, Inc. (In re KBR, Inc.),* 744 F.3d 326, 334 (4th Cir. 2014); see also

*McMellon v. United States*, *supra* at 371. The moving party has the burden to

demonstrate the application of the factors and *Baker* factors are "probably listed in

descending order of both importance and certainty." *Vieth v. Jubelirer*, 541 U.S.

267, 277 (2007). A "discriminating analysis of the particular question posed" is

required. *Baker, supra* at 211.

The District Court found that the first *Baker* prong, "a textually demonstrable constitutional commitment of the issue to a coordinate political department," and "perhaps" the fourth, "the impossibility of a court's undertaking independent resolution [of the issue] without expressing lack of the respect due coordinate branches of government," made the political question doctrine applicable. A129. In a footnote the court added that the acts in question were taken under a NATO operation so "other *Baker v. Carr* formulations might be invoked," A128, but did not specify what those formulations might be. The supporting rationale was distilled in two sentences:

> The conducting of a belligerent operation is entrusted by the Constitution to the executive branch of government, subject to review by the legislative branch of government. Because allowing plaintiff's case to proceed would require this court to review the conducting of such an operation, the political question doctrine makes it nonjusticiable.

No discovery or evidentiary hearing was held on this finding, contrary to Appellant's requests, and no particularized findings were made by the Court to connect the facts to the first prong *Baker* criteria. The Court merely assumed that the fact that the Navy role in the approach and destruction alone compelled a finding of constitutional commitment of the issue to a coordinate political department.

First, the absence of discovery and evidentiary hearings to make this determinative finding constituted legal error. *Kerns v. United States*, *supra* at 192-

17

193 ("when the jurisdictional facts are inextricably intertwined with those central to the merits, the court should resolve the relevant factual disputes only after appropriate discovery").

The lack of discovery and evidentiary hearings led to fundamentally flawed findings.

Belligerency means a state of being at war or conflict with a legally recognized belligerent state or nation. [2] Piracy, by contrast, is a crime committed for private ends by the crew or passengers of a private ship. Articles 15 and 17, Geneva Convention on the High Seas of 1958, ratified by the United States ("1958 Geneva Convention"), 13 U. S. T. 2312, T. I. A. S. No. 5200 (April 29, 1958); *Sosa v. Alvarez-Machain,* 542 U.S. 692, 762 (2004); *United States v. Dire,* 680 F.3d 446, 455 – 460 (4th Cir. 2012). No declared war existed as to the *JCT 68*, of course, nor did any nation state claim to control it and, hence, the very word belligerency sharply mischaracterized these facts. The mere fact that the Navy undertook the operation cannot turn the activity into belligerency. Many ordinary police actions involve force or the threat of force so *SWG*'s use of arms to pacify the Somalis could not turn the encounter into belligerency.

---

[2] See *United States. v. The Ambrose Light*, 25 Fed. 408, 419 (D.C. Cir. 1885) ( "The recognition by foreign states of a state of war in civil strife, or, what is the same thing, a recognition of the belligerent rights of the insurgents, authorizes courts of law to treat the insurgents as lawful combatants"). See also 10 U.S.C. § 948a (defining belligerents as an individual within the meaning of Article 4 of the Geneva Convention Relative to the Treatment of Prisoners of War).

The mission statement, planning and approach of the *SWG* were wholly consistent with a traditional police action on the high seas, no different than a police officer stopping of a vehicle on any highway. As the court properly noted, SWG was "directed as part of the counter piracy operation to force the JCT 68 … to stop and surrender, using force if necessary." A128. "In accordance with an approved plan, the *USS Groves* employed a graduated use of force, including verbal warnings, and then rounds fired to disable the pirates' skiffs stowed on the JCT 68's bow." *Id.* At the time of the approach, "the *SWG* enjoyed complete freedom of action with respect to the *JCT 68*. … At no time did the *JCT 68* seek to initiate a threat of piracy to the *SWG*." A3.

The elaborate statements of policy from the President and the United Nations stand for the proposition that the anti-piracy measures constitute international law enforcement actions. The Presidential statement of policy described a coordinated police action against a crime. See A40 -41 ("Policy for the Repression of Piracy and Other Criminal Acts of Violence at Sea"; Statement of President George W. Bush ("[p]iracy is a universal crime, and all states are obligated to cooperate to the fullest possible extent in the repression of piracy" citing Articles 14-15, Geneva Convention on the High Seas (1958), and Articles 100-101, Law of the Sea Convention (1982)).  The United Nations Resolution 1976 dated April 11, 2011, A34, started from the proposition that "international

19

law, as reflected in the United Nations Convention on the Law of the Sea of 10 December 1982 (Convention), in particular its articles 100, 101 and 105, sets out the legal framework applicable to combating piracy and armed robbery at sea." The United Sates National Security Council report restates the law enforcement setting under international law. [3] The absence of any judicial process arrangements for the Somalis is consistent with a rescue mission.

The stop and rescue mission of the *SWG* had all the incidents of an ordinary law enforcement action at sea. The whole point of the plan of approach was to make for an uneventful boarding consistent with a police action.

Discovery and evidentiary hearings was particularly necessary as to destruction of the *JCT 68*.

The decision to sink the *JCT 68* with the remains of Master Wu aboard, in particular, was totally removed from any element of conflict: the gunfire had subsided the day before and the Somalis had been removed from the vessel. A67. The *JCT 68* had been tethered near the *SWG* so the *JCT 68* posed no threat to the

---

[3] The statement starts with the proposition that:

> Maritime piracy is a universal crime under international law which places the lives of seafarers in jeopardy and affects the shared economic interest of all nations.

A46.

*SWG* or any other vessel. A67. "The JCT 68 was, in fact, seaworthy after the surrender of the pirates." A8.

The Court's finding that "disobedience of the [destruction] order [from NATO] would have caused the *USS Groves* to travel thousands of nautical miles away from the counter-piracy theater, thus reducing the assets available to the operation and substantially interfering with the conducting of the operation," A130, was wholly unsupported by any record reference. It was, in fact, at odds with the Navy's stated "hazard to navigation" rationale. See A67 ("SWG returned the remains of the Taiwanese master to JCT 68, conducted a short burial service, and then sank the JCT 68 as a hazard to navigation using CIWS and 76mm fire").

Discovery and evidentiary hearings would have permitted inquiry into the basis of the hazard to navigation claim, the opportunity to seek out maritime salvors, insurers or flag state interests from the Republic of China (Taipei) to rescue the *JCT 68*, the duty to arrange for bringing the vessel into port for adjudication, the authority to destroy the *JCT 68* under U.S. law and Navy doctrine, and the property rights of shipowners dispossessed of their ships by pirates.[4]

The cases upholding application of *Baker* political question non-justiciability relied upon by the Government are distinguishable because they deal

---

[4] As discussed below, the property rights of Appellant as a shipowner and flag state identification, the Republic of China (Taipei) here, survive the piracy.

with national defense confrontations or claims by military personnel governed by the particular restrictions of *Feres v. United States*, 340 U.S. 135 (1950).

*Tiffany v. Unites States*, 931 F.3d 271, 277  (4th Cir. 1991) is readily distinguishable as it  "involve[d] a civilian injury that followed from actions taken in actual military defense of our country" which represent "perhaps the most clearly marked for judicial deference are provisions for national security and defense." Avoidance of judicial review of the "strategy and tactics employed on the battlefield" was the motivating principle. *Id. See also Taylor v. Kellogg , Brown & Root Services, Inc.,* 658 F.3d 402 (4th Cir. 2011) (negligence claim arising out of electrocution of Marine installing backup generator on Iraqi base nonjusticiable under political  question doctrine owing to inability to review Marines decision to add back up power). The approach used here by a theatre commander under the auspices of international law prohibitions of piracy are starkly distinguishable from the Presidential decision to attack a facility involved with production of chemical weapons in *El-Shifa Pharmaceutical Industries Co. v. United States,* 607 F.3d 836 (D.C. Cir. 2009). Likewise, the injury of Turkish seamen in the course of a military missile training exercise involved military risks to all involved members of the military.  *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997). The combatant activities exception to the Federal Tort Claims

Act in 28 U.S.C. § 2680(j) as discussed in *Al Shimari v. CACI International, Inc*., 658 F.3d 413 (4th Cir. 2011) is inapplicable because this is not an FTCA case..

### b. The Court's Dismissal of Interests of Shipowners in Recovery for Vessel Damages under Admiralty Precedent Constituted Manifest Error.

The District Court's attempt to distinguish maritime "[c]ases such as *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215 (1945), *Pacific-Atlantic S.S. Co v. United States*, 175 F.2d 632 (4th Cir. 1949) and *Lind v. United States*, 156 F.2d 231 (2d Cir. 1946)" on the grounds that "the negligence forming the basis for the suits arose from the operation of the vessel owned by the United States, not from an act of belligerency," A129, was too cryptic to be truly explanatory. Evidently, the court sought to cabin PVA liability primarily in errors of navigation to the exclusion of other forms of negligence.

### (i) The Court's suggestion that the PVA is limited to errors of navigation was erroneous.

The PVA has long been understood to attribute to the vessel the acts and omission of its officers and crew so the range of activities that can lead to liability is not limited to vessel maneuvers.

The Supreme Court has declared that "a narrow interpretation of the [PVA] Act is not justifiable. While the general history of the Act as outlined above does not establish that the statute necessarily extends to the non-collision cases in view of the rule of strict construction of statutory waiver of sovereign immunity, we

23

think Congressional adoption of broad statutory language authorizing suit was deliberate." *Canadian Aviator, Ltd. v. United States*, 324 U.S. 215, 222 (1945). The PVA "was intended to impose on the United States the same liability (apart from seizure or arrest under a libel in rem ) as is imposed by the admiralty law on the private  ship-owner." *Weyerhaeuser S.S. Co. v. United States*, 372 U.S. 597, 600 (1963).

The District Court's construction of the PVA so as to limit "the negligence forming the basis for the suits [arising] from the operation of the vessel" ignored the settled juristic person doctrine whereby acts of the crew of the vessel are attributed to the vessel under admiralty law. The phrase "caused by a public vessel" constituted "an adoption by Congress of the customary legal terminology of admiralty law which refers to the vessel as causing the harm although the actual cause is the negligence of the personnel in the operation of the ship." *Canadian Aviator, Ltd. v. United States*, *supra* at 224. "The consent to suit embodied in the [PVA] thus extends to cases where the negligence of the personnel of a public vessel in the operation of the vessel causes damage to other ships, their cargoes, and personnel, regardless of physical contact between the two ships, and where principles of admiralty law impose liability on private parties." *Id.* (citations omitted).

Applying this principle, crew and officer actions well beyond mere navigational errors can yield liability in this circuit and virtually every circuit court under the maritime Good Samaritan cases. A maritime rescuer who does harm may be liable either for negligence that worsens the position of the victim or for reckless and wanton conduct. [5] The two classic ways of incurring liability, by increasing the risk of harm to the person in distress or to induce reliance, either by the subject or other potential rescuers, can be satisfied readily here.

The *SWG* did much more that increase the *risk* of harm here, it did the harm. A96.

_____

[5] Thus, the U.S. Coast Guard has no duty to commence a rescue.

> But, once the Coast Guard undertakes a rescue operation, it must act with reasonable care. Its actions are judged according to the so-called 'Good Samaritan' doctrine. Under this doctrine, a defendant [becomes] liable for breach of a duty voluntarily assumed by affirmative conduct, even when that assumption of duty was gratuitous.

> The Good Samaritan doctrine, however, sets a high bar to impose liability on a rescuer. The evidence must show that the rescuer failed to exercise reasonable care in a way that worsened the position of the victim. There are two ways in which a rescuer can worsen the position of the subject of the rescue. The first is by increasing the risk of harm to the person in distress. The second is to induce reliance, either by the subject or other potential rescuers, on the rescuer's efforts. The test is whether the risk was increased over what it would have been had the defendant not engaged in the undertaking at all.

*Turner v. United States,* 736 F.3d 274, 280-281 (4th Cir. 2013) (citations and quotation marks omitted). See also *Furka v. Great Lakes Dredge & Dock Co.*, 755 F.2d 1085, 1088 (4th Cir. 1985).

25

Navy acts beyond mere navigational errors are covered by the PVA. A wartime collision between a private vessel and Navy ship caused by the Navy policy of operating at night under blackout was adjudicated. *Pacific-Atlantic S.S. Co. v. United States*, 175 F.2d 632, 641 (4th Cir. 1949). Navy operating procedures deemed negligent yielded liability. *Ocean S.S. Co. v. United States*, 38 F.2d 782, 786 (2nd Cir. 1930) ("We have no power to dispense with the [navigation] statute, nor indeed has the Navy. As they [submarines] now sail they are unfortunately a menace to other shipping and to their own crews, as this unhappy collision so tragically illustrates."); *United States v. The Australia Star: The Hindoo*, 172 F.2d 472 (2nd Cir. 1949) (a 1944 war time claim arising out night time black out operations of Navy escort); see also *Ira S. Bushey & Sons, Inc. v. United States*, 398 F.2d 167, 168-69 (2nd Cir. 1968)(sustaining PVA liability for damage to drydock caused when intoxicated Coast Guard seaman returning to vessel turned valves controlling flood tanks). A wide range of Navy vessel activities have been found justiciable even in war time. [6]

---

[6] See also *Lind v. United States*, *supra* at 232 (liability for a 1944 collision between a fishing vessel and a Liberty ship operating in convoy without lights to escape detection); *Bank Line Ltd. v. United States*, *supra* at 139, (granting discovery relating to a war time collision between private vessel and public vessel operating in convoy off Casablanca).

(ii) The District Court's justification for Dismissal of the Vessel Damages claim based on unexamined suggestion of differing standard of separation of powers for *in rem* cases was erroneous.

The support or logic for a lesser standard of separation of power concerns for *in rem* cases over tort cases espoused by the District Court, ("because prize cases are *in rem* actions, not tort suits, over which admiralty courts have traditionally had jurisdiction"), A129, cannot withstand analysis.

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) the Supreme Court recited with approval cases taking jurisdiction over tort claims by shipowners arising out of seizures and damages to ships perpetrated by privateers and other trespassers.[7]

---

[7] The Court noted at *Sosa v. Alvarez-Machain*, *supra* at 720:

> The sparse contemporaneous cases and legal materials referring to the ATS [Alien Tort Statute] tend to confirm both inferences, that some, but few, torts in violation of the law of nations were understood to be within the common law. In *Bolchos v. Darrel*, 3 F. Cas. 810, (No. 1,607) (SC 1795), the District Court's doubt about admiralty jurisdiction over a suit for damages brought by a French privateer against the mortgagee of a British slave ship was assuaged by assuming that the ATS was a jurisdictional basis for the court's action. Nor is *Moxon v. The Fanny*, 17 F. Cas. 942, (No. 9,895) (Pa 1793), to the contrary, a case in which the owners of a British ship sought damages for its seizure in United States waters by a French privateer. The District Court said in dictum that the ATS was not the proper vehicle for suit because "[i]t cannot be called a suit for a tort only, when the property, as well as damages for the supposed trespass, are sought for." *Id.*, at 948. But the judge gave no intimation that further legislation would have been needed to give the District Court jurisdiction over a suit limited to damages.
>
> Then there was the 1795 opinion of Attorney General William Bradford, who was asked whether criminal prosecution was available against Americans who had taken part in the French plunder of a

*Id*. at 720. Many of the cases arising out of claims of piratical activities included

alternative claims for damages to ships. See, e.g., *Miller v. The RESOLUTION*, 2

U.S. 1 (1781); *Murray v. The CHARMING BETSY*, 6 U.S. 64 (1804); *The*

*PALMYRA*, 25 U.S. 1 (1827). [8]

---

British slave colony in Sierra Leone. 1 Op. Att'y Gen. 57. Bradford
was uncertain, but he made it clear that a federal court was open for
the prosecution of a tort action growing out of the episode:

> "But there can be no doubt that the company or individuals
> who have been injured by these acts of hostility have a
> remedy by a *civil* suit in the courts of the United States;
> jurisdiction being expressly given to these courts in all cases
> where an alien sues for a tort only, in violation of the laws of
> nations, or a treaty of the United States . . . ." *Id*., at 59.

[8] As "a seizure of a vessel in violation of international law does not affect the
jurisdiction of a United States court to adjudicate rights in connection with the
vessel," *United States v. Alvarez-Machain*, 504 U.S. 655, 668 fn 15 (1992), courts
have a long history of judging competing claims.

In *The Santissima Trinidad,* 20 U.S. 283 (1822) the Supreme Court affirmed
the claims of original owners for restoration of the property – originally vessels
and cargo but substituted the funds from the sales -- illegally seized by
commissioned naval vessels. A libel sought restitution of the ships and cargoes
piratically taken out of the Spanish ships*, Santissima Trinidad* and *St. Ander*, on
the high seas by two capturing South American naval vessels which claimed them
as war prizes. The court concluded that restitution to the original owners was
necessary because the capture constituted "a violation of the law of nations as well
as of our own municipal laws, and as a violation of our neutrality" which "infects
the captures subsequently made with the character of torts, and justifies and
requires a restitution to the parties who have been injured by such misconduct." *Id*.
at 348, 349. See also *Jecker v. Montgomery*, 54 U.S. 498, 516 (1852)  (if the
conduct of the captor has been unjust and oppressive, the court may refuse to
adjudicate upon the validity of the capture, and award restitution and damages
against the captor; the same rule applies for delay in instituting proceedings);
*L'Invincible,* 14 U.S. 1, 1 Wheat 238, 258 (1816) ("That the mere fact of seizure as
prize does not, of itself, oust the neutral admiralty court of its jurisdiction is

In sum, then, the finding of political question nonjusticiability was based on three fundamental errors. The court made findings of fact as to the nature and character of the events without required evidentiary hearing or discovery. The Court provided no particularized findings to support a commitment of the issues presented to another branch of government, wrongly relying on the Navy role and the use of force as sufficient to yield a "belligerency." The actual documents submitted by the Government all speak of the anti-piracy initiative as a police action taken under international law. Terming the action as belligerency was clear error as no conflict between states took place.

Most significantly, the failure to hear evidence as to the actual authority and rationale for the destruction of the *JCT 68* as well as alternatives short of destruction (e.g., salvors; flag state intervention; escort to intermediate port or other vessel assistance) yielded a fanciful rationale at odds with the Navy's stated hazard to navigation justification.

Further, in dismissing the claim for damages to the *JCT 68*, the Court thoroughly mischaracterized the governing maritime precedent as to admiralty

---

evident from this fact, that there are acknowledged cases in which the courts of a neutral may interfere to divest possession."); *Restatement, 2d of Torts*, § 927 ("(1) When one is entitled to a judgment for the conversion of a chattel or the destruction or impairment of any legally protected interest in land or other thing, he may recover either (a) the value of the subject matter or of his interest in it at the time and place of the conversion, destruction or impairment ….").

jurisdiction wrongly ignoring consideration of the Circuit's Good Samaritan doctrine and the deeply rooted admiralty law granting shipowners recourse for damages to vessels. The foregoing is more than sufficient to warrant setting aside the District Court order.

More fundamentally, the Court applied an erroneous legal test in its routine evaluation of the *Baker* political question doctrine under the PVA. In the PVA, Congress' waiver of sovereign immunity for United States Navy vessel activities was specific, not a generalized waiver of sovereign immunity that swept in Navy activities on some incidental basis. Special rules for discovery against the Navy were included in the measure. To routinely apply *Baker* first and second prong tests to sustain non-justiciability in a PVA case would yield an analytical tautology that would neatly eviscerate the central purpose of the waiver of immunity. This important matter is taken up at length below.

### 2. The Discretionary Function Doctrine has no Application to this case because the Navy Destruction of the *JCT 68* was Contrary to Law and Unauthorized -- Arguments that Parties Never had the Opportunity to make.

The District Court finding, in a footnote, that Appellant's action was "futile" because under *McMellon* the discretionary function imported into the SIAA would protect gunfire of the SWG as an exercise of discretion, A129, was made without the benefit of any submissions from the parties.

The Court did not seek or obtain briefing on the status of the discretionary function under the SIAA or the limits of the discretionary function itself, much less the application of the PVA, the primary cause of action inasmuch as the SWG was a public vessel. The finding was therefore fatally premature. *Kerns v. United States, supra.*

Yet, even assuming that the PVA was deemed to have an exception for discretionary functions – which Appellant denies -- it would not shelter the Navy from liability for the acts alleged in the Complaint. Under longstanding U.S. and international law, the courts are assigned the action to be taken with regard to a vessel recaptured from pirates, not the executive. The destruction of the *JCT 68* contrary to law and without authority was therefore outside any protection that might otherwise be available under a discretionary function exception.

### a. Acts Contrary to Law or Beyond Lawful Discretion of Actor are outside the protection of the Discretionary Function Exception

The dictionary function doctrine will not shelter Government decisions that are contrary to law or rule, unconstitutional, or beyond the authority of the government actor. *Berkovitz v. United States*, 486 U.S. 531, 544 (1988) ("When a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply."); *Medina v. United States*, 259 F.3d 220, 225 (4th Cir. 2001) ("federal officials do not possess

discretion to violate constitutional rights or federal statutes") (quoting *United States Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988)); *K. W. Thompson Tool Co. v. United States*, 836 F.2d 721, 727 n.4 (1st Cir. 1988) ("It has been held that implicit in [*United States v. Varig Airlines,* 467 U.S. 797 (1984)] and [*Dalehite v. United States,* 346 U.S. 15 (1953)] is the proposition that a 'decision cannot be shielded from liability if the decisionmaker is acting without actual authority.'") (quoting *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1196 (D.C. Cir. 1986)); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) ("Governmental conduct cannot be discretionary if it violates a legal mandate."); *B & F Trawlers, Inc. v. United States,* 841 F.2d 626, 632 (5th Cir. 1988).

### b. Courts, not the Executive, Decide Action to be taken with regard to a Vessel Recaptured from Pirates under U.S. and International Law.

The international norms in Article 19 of the 1958 Geneva Convention on the High Seas provide that "[t]he *courts* of the State which carried out the seizure [of a pirate vessel] may decide upon the penalties to be imposed, and may also determine the action to be taken with regard to the ships, aircraft or property, subject to the rights of third parties acting in good faith." 13 U. S. T. 2312, T. I. A. S. No. 5200 (emphasis added). The starting point for the High Seas Convention, the Harvard Research in International Law Draft Convention on Piracy, 26 Am. J.

Int'l L. 743 (1932), "sought to catalogue all judicial opinions on piracy and codify the international law of piracy." *United States v. Dire, supra* at 458 (quoting *United States v. Hasan,* 747 F. Supp. 2d 599, 619 (E.D. Va. 2010)).

Articles 104 and 105 of United Nations Convention on the Law of the Sea ("UNCLOS"), which has over 160 signatory nations, though not the United States, restate precisely the same terms as Articles 18 and 19 of the 1958 Geneva Convention. The United States Solicitor General "has recognized that its [UNCLOS] baseline provisions reflect customary international law." *United States v. Alaska,* 503 U.S. 569, 588 n.10, (1992) (internal quotation marks omitted); see also *United States v. Dire*, 680 F.3d 446, 469.

The courts have exclusive jurisdiction to address the treatment of captured ships. *Dooley v. United States*, 182 U.S. 222, 234-235 (1901) ("neither the President, nor the military commander, could establish a court of prize, competent to take jurisdiction of a case of capture, whose judgments would be conclusive in other admiralty courts"). In response to an inquiry from the President, relating to an American ship captured by a French ship and then later liberated, the Attorney General United States restated in 1838 U.S. law of capture thusly:

> By the well-settled principles of international law, it is made the duty of the captors to place an adequate force upon the captured vessel. …
>
> It is a principle of international law equally well established, that the capture transfers no property in the vessel and cargo to the captors …

33

The next point of inquiry suggested by this application is the authority of the Executive to direct the delivery of the vessel and cargo. Without discussing the relative functions and powers of the different departments of the government, it is sufficient to observe, that the case, as presented by the French government, calls for a decision not executive, but judicial.

3 Op. Atty. Gen. 377 (1838).  See also 1 Op. Atty. Gen. 584 (1822).

U.S. Navy doctrine does not authorize destruction of recaptured vessels but rather requires preservation of pirated vessels and delivery to judicial authorities.[9]

The law has long recognized that "the rightful owner is not deprived of his title by virtue of acts of piracy relating to his goods."  Brownlie, I, *Principles of Public International Law,* (Sixth Ed. 2003) at 230.  "[A] taking by pirates has none

---

[9]   The U.S. Navy, *The Commander's Handbook on Law of Naval Operations,* Annotated Supplement at page 3 – 12 (1997 Ed.) section 3.5.3 states:

> A pirate vessel or aircraft encountered in or over U.S. or international waters may be seized and detained by any of the U.S. vessels or aircraft listed in paragraph 3.5.3. *The pirate vessel or aircraft, and all persons on board, should be taken, sent, or directed to the nearest U.S. port or airfield and delivered to the nearest port or U.S. airfield and delivered to U.S. law enforcement authorities for disposition according to U.S. law.* Alternatively, higher authority may arrange with another nation to accept and try the pirates and dispose of the pirate vessel or aircraft, since every nation has jurisdiction under international law over any act of piracy.

(emphasis added; footnotes omitted). The full text is available at http://www.fichl.org/uploads/media/US_Navy_Commander_s_Handbook_Annotated_Supplement_1997.pdf

The Navy report itself suggests that destruction of vessels was unauthorized. A74.

of facts of [a legal] capture. It does not dives [sic] the actual owner of the property, and cannot be followed by a sentence of condemnation in a competent court." Wheaton, H., *A Digest of the Law of Maritime Captures and Prizes,* at 54 (McDermut 1815). [10] "As pirates acquire no title to what they take, on recapture it reverts to the proprietor." Woolsey, T.W., *Introduction to the Study of International Law* (Sixth Ed. 1891) at § 144 at 234. [11] See also *The JOSEFA SEGUNDA*, 18 U.S. 338, 357 (1820) ("It would indeed be unreasonable and unjust to visit upon the innocent owners of this property the sins of a pirate.")

Similarly, where a recapture is made from a pirate

> there can be no doubt the property ought to be restored to the owner; for as pirates have no lawful right to make captures, the property has not been divested from him. He has only been deprived of its possession, to which he has been restored by the recapture.

Wheaton, *supra* at 237. The general rule for goods is the very much the same. See *Restatement, 1st of Restitution*, § 128 ("A person who has tortuously obtained, retained, used, or disposed of the chattels of another, is under a duty of restitution to the other.").

---

[10] The full text of the book is available at https://archive.org/stream/adigestlawmarit00wheagoog#page/n8/mode/2up.

[11] The full text of the book is available at https://archive.org/stream/introductiontos10woolgoog#page/n7/mode/2up.

This was the approach endorsed by the Fifth Circuit in *B & F Trawlers, Inc. v. United States*, *supra*. Plaintiff shipowner, whose vessel had been stolen and used for drug running, brought a suit under the PVA against the U.S. Coast Guard for negligence in care and control of the vessel after it was captured by Coast Guard and destroyed while under tow. The court permitted the damages claim to proceed reasoning that the destruction of the vessel may have been unauthorized.

> We assume that some Coast Guard regulations may govern the agency's operations in regard to boarding, searching, arresting and transporting vessels found to contain contraband. …. [T]hen the destruction may have been caused by a violation of Coast Guard regulations. In such an event, neither [*United States v. Varig Airlines, supra.]*, as quoted above, nor our Circuit's decision in *Collins v. United States*, 783 F.2d 1225, 1229-30 (5th Cir. 1986), would shield the government from liability.

*Id.* at 632.

Here, the court erred in the peremptory conclusion that the case was governed by the discretionary exception. Appellant never had the opportunity to discuss the application of the discretionary function exception or the scope of the authority of the Navy actors. Dismissal was quintessentially premature and irrational. See *Kerns v. United States, supra.*

**3. The PVA specifically contemplated judicial review of the actions of Navy vessels on the High Seas and Crafted Judicial Measures to control discovery against Military Commanders; therefore, Routine Application of the First two Prongs of *Baker* here was error.**

**a. The PVA was a Wartime Measure Intended to broadly waive Sovereign Immunity as to U.S. Navy vessels with Specific Mechanisms for Discovery against Military Commanders.**

Briefly, Congress created the United States Shipping Board in 1916 to revitalize the U.S. merchant fleet in connection with the World War I hostilities. The Shipping Act of 1916, 39 Stat. 728 *et seq*., made United States Shipping Board vessels, which were publically owned merchant vessels, subject to all laws, regulations, and liabilities governing merchant vessels notwithstanding the sovereign ownership and operation. When this waiver of immunity proved insufficient, Congress expanded Government liability with the Suits in Admiralty Act in 1920, 41 Stat. 525- 26, 46 U.S.C. §§ 30901 *et seq*. to permit actions for damages against the Government in any case where if the Government merchant vessel were privately owned or operated a proceeding in admiralty could be maintained. The SIAA did not waive sovereign immunity for damages caused by a "public vessel" operating outside the merchant trade such as naval or coast guard vessels. See *McMellon v. United States*, *supra* at 335.

Congress passed the PVA in 1925 without any exceptions to its waiver of sovereign immunity for any particular claims otherwise falling within its scope. *McMellon v. United States*, *supra* at 335. The liberality of the PVA was such that

the waiver extended five years retroactively to cover claims that arose in 1920. 43

Stat. 1112. Rules governing discovery against officers and crews of the public

vessels were set out. [12] One of the Congressional policy objectives was to bring

American practice into conformity with that of European maritime nations. H.R.

Rep. No. 68 – 913 at 15 (1924).

In 1944 the PVA was amended to provide for stays of proceedings and

access to testimony and other evidence where the Secretary of Navy certified to a

court  "that the prosecution of such suit would tend to endanger the security of

naval operations in such war, or to interfere with such operations." See 58 Stat. 723

– 726. Even in the cases in which the Navy so moved the actions were not

dismissed; rather, they were merely stayed until six months after cessation of

hostilities.[13]

---

[12] 43 Stat. 1112 ("no officer or member of the crew of any public vessel of the
United States may be subpoenaed in connection with any suit authorized under this
act without the consent of the secretary" of the department "having control of the
vessel at the time the cause of action arose or  …  of the commanding officer of
such vessel.").

[13] Because stay of proceedings in pending suits as provided in this section did "not
operate to suspend the issuance of process to take or preserve evidence to be used
in the trial of the issues of the suit," the Secretary was required to submit an
additional certificate  "that the issuance of such process to preserve evidence or the
completion of action on process already issued would tend to endanger the security
of the United States or any of the naval or military operations in such war, or to
interfere with such operations" to defer discovery.  A party adversely affected by
the stay of discovery could petition the Secretary of the Navy for reconsideration
and the Secretary of the Navy or designee was required to "hold in secret a hearing

Courts have applied maritime jurisdiction against U. S. Navy and Coast

Guard vessels even in war time.  In 1947 the Navy had over 100 PVA claims

pending. *Bank Line v. United States,* 163 F.2d 133, 135 n.1 (2nd Cir. 1947).

### b. Routine application of *Baker v. Carr* factors to PVA would eviscerate the PVA and undermine the line of decisions under the PVA.

The Congressional and Executive intention to waive liability as to the

operation of U.S. Navy vessels must prevail over the general presumption against

review of military decisions contemplated in the first *Baker* factor particularly

since even secret wartime actions were not exempted. As for the second *Baker*

prong, "a lack of judicially discoverable and manageable standards," the provisions

for discovery against the Navy in the PVA also provide the court with

congressionally approved manageability solution as well as a long history of such

claims.

Statutory context is fundamental to claims of political justiciability.  The

Supreme Court overturned the District of Columbia Circuit Court of Appeals

determination that a statute permitting dual citizenship was non-justiciable based

on the grant of a specific statutory right. *Zivotofsky v. Clinton,* 132 S. Ct. 1421,

---

at which the claimant or his representative may present such facts and arguments
as he may think material with respect to the question as to whether or not a stay
should be issued or maintained." Within ten days the Secretary was required to file
a further certificate to continue the stay of discovery. 58 Stat. 724 - 725 (1944).

1427 (2012) ("The existence of a statutory right, however, is certainly relevant to the Judiciary's power to decide [a plaintiff's] claim."). Where the courts merely to "enforce a specific statutory right," it is a "familiar judicial exercise" as to which the political question will not apply. *Id.* "*[U]nless Congress specifically has provided otherwise*, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988)(emphasis added).

Accordingly, the first two *Baker* factors, having been directly addressed in the PVA, cannot sustain the burden of proof on political question non-justiciability.[14]

---

[14] Other circuits have struggled with the issues but have recognized limitations of the scope of the PVA. The Fifth Circuit has declined to import broad exceptions to the PVA. *B & F Trawlers, Inc. v. United States*, *supra* at 629 (5th Cir. 1988) ("If the law enforcement exception is to be engrafted into the SIAA and PVA, then the grafting should be done by legislative surgeons, not judicial surgeons" but the discretionary function exception in principle shields from tort liability the Coast Guard's apprehension seized drug-running vessels). The Ninth Circuit has imported exceptions in the PVA for combatant and discretionary functions. See *Koohi v. United States,* 976 F.2d 1328, 1336 (9th Cir. 1992) (incorporation of the combatant activities exception into the PVA "particularly appropriate"); *Tobar v. United States,* 731 F.3d 938, 945 (9th Cir. 2013) ("We join our sister circuits in holding that the discretionary function exception also applies to the PVA's waiver of sovereign immunity."). The First and Eleventh Circuit imported discretionary function exceptions into the PVA. *Thames Shipyard & Repair Co. v. United States,* 350 F.3d 247, 254 (1st Cir. 2003); *Cranford v. United States*, 466 F.3d 955, 959 (11th Cir. 2006).

The District Court's routine application of the first two *Baker* tests to sustain political question non-justiciability therefore constituted legal error.

## VI.    CONCLUSION AND RELIEF SOUGHT

The dismissal of the Complaint must be set aside and the case remanded to the District Court for further proceedings.

## VII.    REQUEST FOR ORAL ARGUMENT

Appellant respectfully requests oral argument.

Respectfully submitted,

/s/ Timothy B. Shea
Timothy B. Shea
Nemirow Hu & Shea
1900 L Street, NW, Suite 303
Washington, DC  20036
Tel. (202) 835-0300
Fax (888) 522 4519
timbshea@gmail.com


/s/ Thomas G. Corcoran, Jr.
BERLINER, CORCORAN
& ROWE, L.L.P.
Thomas G. Corcoran, Jr., Esq.
1101 Seventeenth Street, N.W.
Suite 1100
Washington, D.C. 20036
tgc@bcr-dc.com
lcl@bcr-dc.com
Tel. (202) 293-5555
Fax (202) 293-9035

*Counsel for Appellant*

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

No. <u>14-1206</u> Caption: <u>Wu Tien Li-Shou v. United States of America</u>

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Certificate of Compliance With Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

*[Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines; Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines; any Reply or Amicus Brief may not exceed 7,000 words or 650 lines; line count may be used only with monospaced type]*

[ X ]    this brief contains <u>10,653</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[  ]    this brief uses a monospaced typeface and contains _____lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:
*[14-point font must be used with proportional typeface, such as Times New Roman or CG Times; 12-point font must be used with monospaced typeface, such as Courier or Courier New]*

[ X ]    this brief has been prepared in a proportionally spaced typeface using <u>MS Word 20013 in</u><u>14 point Times New Roman font</u>; *or*

[  ]    this brief has been prepared in a monospaced typeface using _____ _____with____characters per inch _____font

May 28, 2014                         <u>/s/ Timothy B. Shea</u>
                                    Timothy B. Shea
                                    Counsel for Appellant

42

# United States Court of Appeals
# for the Fourth Circuit

*Wu Tien Li-Shou v. United States of America*, No. 14-1206

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by TIMOTHY B. SHEA, Attorney for Plaintiff-Appellant to print this document. I am an employee of Counsel Press.

On **May 28, 2014**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

THOMAS MacKINNON BROWN
U.S. DEPT. OF JUSTICE
1425 New York Avenue, NW
Washington, DC 20005-0000
(202) 616-4033
thomas.m.brown@usdoj.gov

JILL DAHLMANN ROSA
U.S. DEPT. OF JUSTICE
P.O. Box 14271
Washington, DC 20530
(847) 732-1141
jill.rosa@usdoj.gov

DOUGLAS NEAL LETTER
ANNE MURPHY
U.S. DEPT. OF JUSTICE
950 Pennsylvania Ave., NW
Washington, DC 20530
(202) 514-3602
douglas.letter@usdoj.gov
anne.murphy@usdoj.gov

Additionally, two paper copy will be mailed to the above counsel on this date.

Unless otherwise noted, 8 paper copies have been filed with the Court on the same date via U.S. Express Mail.

May 28, 2014                         /s/ Robyn Cocho
                                     Counsel Press

43