No. 14-1206

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

————————————

WU TIEN LI-SHOU,

Plaintiff-Appellant,

v.

UNITED STATES OF AMERICA,

Defendant-Appellee.

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND

————————————

## BRIEF FOR THE UNITED STATES OF AMERICA, APPELLEE

————————————

**STUART F. DELERY**
  *Assistant Attorney General*

**ROD J. ROSENSTEIN**
  *United States Attorney*

**DOUGLAS N. LETTER**
**ANNE MURPHY**
  *(202) 514-3688*
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7644*
  *U.S. Department of Justice*
  *950 Pennsylvania Ave., N.W.*
  *Washington, D.C.  20530*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................1

STATEMENT OF JURISDICTION....................................................4

QUESTIONS PRESENTED .................................................5

STATEMENT OF THE CASE ................................................6

A.    Modern piracy off the coast of the Horn of Africa, and the
      United States' political and military response..............................6

B.    Facts and Prior Proceedings..........................................10

SUMMARY OF THE ARGUMENT .......................................16

STANDARD OF REVIEW .................................................20

ARGUMENT...............................................................20

I.    PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE
      BECAUSE THEY PRESENT POLITICAL QUESTIONS............20

      A.    The district court correctly held that plaintiff's
            complaint would require it to resolve military and
            foreign relations questions committed to the
            Executive Branch of government.........................................24

      B.    Plaintiff is mistaken in contending that her suit could be
            adjudicated without violating separation-of-powers
            principles..............................................................32

   i.   The political question doctrine bars this suit
        regardless of whether any act of "belligerency"
        was involved, because the suit arises from action
        by a U.S. Navy warship under the command of
        a Royal Netherlands Navy commodore as part
        of a NATO task force....................................................33

   ii.  The district court correctly granted the
        government's Rule 12(b)(1) motion to dismiss
        plaintiff's tort suit without ordering discovery
        into NATO's ongoing counter-piracy operations..........39

   iii. The political question doctrine applies to suits
        under the Public Vessels Act.......................................45

II.  THE STATUTORY WAIVERS OF SOVEREIGN
     IMMUNITY IN THE SUITS IN ADMIRALTY ACT AND
     THE PUBLIC VESSELS ACT DO NOT EXTEND TO
     ACTIONS BASED UPON DISCRETIONARY
     GOVERNMENTAL ACTS, AND THE DISCRETIONARY
     FUNCTION EXCEPTION THEREFORE BARS
     PLAINTIFF'S SUIT.......................................................46

CONCLUSION.........................................................................51

CERTIFICATE OF COMPLIANCE WITH
FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:** **Page**

*Aktepe v. United States,*
105 F.3d 1400 (11th Cir. 1997) ............................... 26, 27, 28, 30, 31, 34

*Al Shimari v. CACI Premier Tech., Inc.,*
___ F.3d ___, 2014 WL 2922840 (4th Cir. June 30, 2014) .................. 39

*Baker v. Carr,*
369 U.S. 186 (1962) ............................... 14, 20, 21, 22, 23, 27, 28, 30, 31

*Boyle v. United Techs. Corp.,*
487 U.S. 500 (1988) ........................................................................... 34

*Canadian Aviator v. United States,*
324 U.S. 215 (1945) ........................................................................... 15

*Cushing v. Laird,*
107 U.S. 69 (1883) ............................................................................. 37

*Foster v. Neilson,*
27 U.S. (2 Pet.) 253 (1829) ................................................................ 50

*Goldstar (Panama) S.A. v. United States,*
967 F.2d 965 (4th Cir. 1992) ............................................................. 50

*The Grotius,*
13 U.S. (9 Cranch.) 368 (1815) .......................................................... 37

*In re KBR, Inc., Burn Pit Litig.,*
744 F.3d 326 (4th Cir. 2014) ................................................ 25, 27, 30, 42

*INS v. Chadha,*
462 U.S. 919 (1983) ........................................................................... 46

iii

*Kerns v. United States*,
  585 F.3d 187 (4th Cir. 2009) ............................................................. 42

*Lebron v. Rumsfeld*,
  670 F.3d 540 (4th Cir. 2012) ................................................. 22, 25, 27

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ........................................................... 21

*The Marianna Flora*,
  24 U.S. 1 (1825) ................................................................................. 9

*McMellon v. United States*,
  387 F.3d 329 (4th Cir. 2004) (en banc) ........................ 15, 46, 47, 48, 49

*Medellin v. Texas*,
  552 U.S. 491 (2008) .......................................................................... 50

*Pacific-Atlantic S.S. Co. v. United States*,
  175 F.2d 632 (4th Cir. 1949) ............................................................ 15

*Rappenecker v. United States*,
  509 F. Supp. 1024 (N.D. Cal. 1980) .............................................. 28, 29

*Simmons v. United Mortg. & Loan Inv., LLC*,
  634 F.3d 754 (4th Cir. 2011) ............................................................ 20

*The Siren*,
  80 U.S. (13 Wall.) 389 (1871) ........................................................... 37

*Smith v. Reagan*,
  844 F.2d 195 (4th Cir. 1988) ............................................................ 27

*Stencel Aero Eng'g Corp. v. United States*,
  431 U.S. 666 (1977) .......................................................................... 44

*Taylor v. Kellogg Brown & Root Servs., Inc.*,
  658 F.3d 402 (4th Cir. 2011) ............................................................ 25

*Thomasson v. Perry*,
  80 F.3d 915 (4th Cir. 1996)................................................................ 22

*Tiffany v. United States*,
  931 F.2d 271 (4th Cir. 1991)......................................23, 25, 28, 31, 34

*Tobar v. United States*,
  731 F.3d 938 (9th Cir. 2013)............................................................. 49

*United States ex rel. Vuyyuru v. Jadhav*,
  555 F.3d 337 (4th Cir. 2009)............................................................. 20

*United States v. Dire*,
  680 F.3d 446 (4th Cir. 2012).............................................................. 9

*United States v. Gaubert*,
  499 U.S. 315 (1991)......................................................................... 48

*United States v. Johnson*,
  481 U.S. 681 (1987)......................................................................... 44

*United States v. Shearer*,
  473 U.S. 52 (1985)........................................................................... 44

*Vulcan Materials Co. v. Massiah*,
  645 F.3d 249 (4th Cir. 2011).......................................................25, 44

*Yousuf v. Samantar*,
  699 F.3d 763 (4th Cir. 2012)............................................................. 23

**Constitution:**

U.S. Const. art. I, § 8, cl. 11-14....................................................... 22

U.S. Const. art. II, § 2, cl. 1............................................................. 22

**Statutes:**

10 U.S.C. § 7651 *et seq*.................................................................... 37

28 U.S.C. § 1291............................................................................... 5

28 U.S.C. § 1333............................................................................... 5

28 U.S.C. § 2680(a) .......................................................................... 49

46 U.S.C. § 30301 *et seq*.................................................................. 4

46 U.S.C. § 30901 *et seq*.................................................................. 5

46 U.S.C. § 31101 *et seq*.................................................................. 5

46 U.S.C. § 31102............................................................................. 45

**Rules:**

Federal Rule of Appellate Procedure 4(a)(1)(B)..................................... 5

Federal Rule of Civil Procedure 12(b)(1) ...........................................5, 16

**Other Authorities:**

3 Op. Att'y Gen. 377 (1838)................................................................ 37

MARCOM Fact Sheet, Operation Ocean Shield, http:// www.mc.
    nato.int/about/Pages/Operation%20Ocean%20Shield.aspx
    (last visited July 29, 2014)......................................................... 9

President George W. Bush, *United States Maritime Security
    (Piracy) Policy* (June 14, 2007) ..............................................7

Shih Hsiu-chuan, *US Gives 'Ex Gratia' Money to Slain Captain's Family*, Taipei Times, Aug. 13, 2011, *available at* www.taipeitimes.com /News/taiwan/ archives/2011 /08/13/2003510640 (last visited July 31, 2014)......................................4

Thomas J. Schoenbaum, 2 *Admiralty and Maritime Law* (3d ed. 2001).........................................................................49

U.S. Nat'l Sec. Council, *Countering Piracy off the Horn of Africa: Partnership & Action Plan* (Dec. 2008) ..........................................7, 35

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

———————————————

## No. 14-1206

———————————————

WU TIEN LI-SHOU,

Plaintiff-Appellant,

**v.**

UNITED STATES OF AMERICA,

Defendant-Appellee.

———————————————

## ON APPEAL FROM THE UNITED STATES DISTRICT
## COURT FOR THE DISTRICT OF MARYLAND

———————————————

## BRIEF FOR THE UNITED STATES
## OF AMERICA, APPELLEE

———————————————

## INTRODUCTION

This maritime tort action against the United States is based upon
an incident that occurred when a U.S. military warship, the USS
Stephen W. Groves, engaged Somali pirates during a NATO counter-
piracy operation in the Indian Ocean. The USS Groves was part of
Operation Ocean Shield, a NATO operation that uses military resources
provided by NATO member States to carry out international counter-

piracy policies established by the United Nations Security Council. NATO assigned the USS Groves to a NATO counter-piracy task force, Task Force 508, which was operating off the Somali coast under the command of a Royal Netherlands Navy Commodore.

Following the orders of the NATO Task Force commander, the USS Groves tracked Somali pirates aboard a Taiwanese fishing vessel, the Jin Chun Tsai 68, which the pirates had commandeered a year earlier and were still using as a "mother ship" for launching further pirate attacks, with the master and crew aboard as hostages. Following a strategy for a graduated use of force developed jointly by the NATO commander and the commander of the USS Groves, the USS Groves fired at skiffs stacked on the foredeck of the seized fishing vessel. After an exchange of fire with the pirates on the ship, the pirates surrendered and the hostages were freed, but a boarding party from the USS Groves discovered that fire from the U.S. vessel had unfortunately killed the vessel's master, Wu Lai-Yu. The next day, following orders from the NATO commander, the USS Groves sank the Jin Chun Tsai 68, with Master Wu's body on board.

Master Wu's widow, Wu Tien Li-Shou, brought this tort suit against the United States, alleging that strategic and tactical counter-piracy decisions by the NATO commander and the crew of the USS Groves were negligent. Plaintiff Wu asserts that the NATO and U.S. military commanders chose the wrong range at which to engage the pirates, selected the wrong type of ordnance to use, and failed to warn the pirates before the engagement which portions of the fishing vessel would be targeted during the attack. Plaintiff further contends that the NATO commander's order to sink the Jin Chun Tsai 68 was a violation of law; she contends that the NATO Task Force should either have notified Taiwanese authorities of the incident so that salvage operations could be conducted, or have brought the fishing vessel from the Indian Ocean to the United States so that rights to the Jin Chun Tsai 68 could be resolved in a judicial action here.

The district court dismissed the case, holding that plaintiff's complaint in this context raised non-justiciable political questions that were not appropriate for litigation. The district court alternatively explained that the actions taken by the military commanders against the Somali pirates aboard the Jin Chun Tsai 68 would be covered in any

event by the discretionary function exception to the waivers of sovereign immunity in the relevant maritime tort statutes (the Suits in Admiralty Act and the Public Vessels Act), which would likewise bar plaintiff's action.

The district court's judgment of dismissal is correct and should be affirmed. While the operation against the Somali pirates here succeeded, Master Wu's death and the sinking of his ship are tragic and regrettable. United States courts are nevertheless not appropriate bodies to second guess actions taken by a U.S. Navy warship operating as part of a U.N.-authorized, multi-national NATO task force commanded by a Dutch commodore off the Horn of Africa against Somali pirates who had commandeered a Taiwanese ship for piratical purposes.[1]

## STATEMENT OF JURISDICTION

Plaintiff asserted claims under the Death on the High Seas Act (46 U.S.C. § 30301 *et seq.*) and general maritime law. She contended

---

[1] Acting under its authority to conduct international relations, the United States made an *ex gratia* payment to Master Wu's family to reflect the Nation's condolences. Shih Hsiu-chuan, *US Gives 'Ex Gratia' Money to Slain Captain's Family*, Taipei Times, Aug. 13, 2011, *available at* www.taipeitimes.com/News/taiwan/archives/2011/08/13/2003510640 (last visited July 31, 2014).

that the Suits in Admiralty Act (46 U.S.C. § 30901 *et seq.*) and the Public Vessels Act (46 U.S.C. § 31101 *et seq.*) waive the United States' sovereign immunity from suit, and asserted admiralty jurisdiction under 28 U.S.C. § 1333. See Joint Appendix A10-A12.[2] The district court, however, dismissed the case under Federal Rule of Civil Procedure 12(b)(1), A131, because plaintiff's claims present a non-justiciable political question.

This Court has jurisdiction under 28 U.S.C. § 1291 over the district court's final order dismissing plaintiff's action. The appeal is timely. The district court entered judgment on January 31, 2014, A3, and plaintiff filed her notice of appeal on March 5, 2014, *ibid.*, within the sixty days allowed under Federal Rule of Appellate Procedure 4(a)(1)(B).

## QUESTIONS PRESENTED

This tort action seeks damages from the United States, based upon actions taken by the U.S. Navy vessel USS Groves in an action

---

[2] Citations to pages designated with an "A" before the page number are to the Joint Appendix.

against Somali pirates while the ship was assigned to a NATO anti-piracy task force and was acting under NATO orders.

The questions presented are:

1. Whether the district court correctly ruled that plaintiff's tort suit against the United States is not justiciable because it would require the courts to make decisions about live-action tactics and foreign relations engaged in by a U.S. Navy warship operating as part of a United Nations-authorized NATO task force carrying out counter-piracy operations off the Horn of Africa.

2. Whether the district court correctly determined that plaintiff's suit is barred in any event because it is based upon actions within the discretion of the NATO commander and the commander of the USS Groves.

## STATEMENT OF THE CASE

### A.    Modern piracy off the coast of the Horn of Africa, and the United States' political and military response.

The United States has a vital interest in global maritime security. As President Bush determined, the "physical and economic security of the United States – a major global trading nation with interests across the maritime spectrum – relies heavily on the secure navigation of the

6

world's oceans for unhindered legitimate commerce by its citizens and its partners." A59.[3] In recent years, the U.S. National Security Council has recognized that piracy off the Horn of Africa has threatened the security of international maritime commerce. See A48.[4] "Somali-based piracy against chemical and oil tankers, freighters, cruise ships, yachts and fishing vessels poses a threat to global shipping." A48. In June 2007, the United States declared a policy against piracy and made a commitment to act vigorously to repress piracy and other form of illicit activity at sea. See A60.

The United States does not combat international piracy alone. As in this instance, it works in co-operation with other nations, because the international community has "a common interest" in promoting "the vibrant maritime commerce that underpins economic security," and in protecting international shipping from "ocean-related criminal and dangerous acts, including piracy." A46. The United States has

---

[3] President George W. Bush, *United States Maritime Security (Piracy) Policy* (June 14, 2007).

[4] U.S. Nat'l Sec. Council, *Countering Piracy off the Horn of Africa: Partnership & Action Plan* (Dec. 2008).

undertaken to "lead and support international efforts to repress piracy and other acts of violence against maritime navigation * * *." A60.

Accordingly, the U.S. National Security Council in December, 2008, implemented a Partnership and Action Plan to "foster international cooperation and integration among all nations, international organizations, industry and other entities that have an interest in maritime security to ensure the full range of lawful and timely actions necessary to repress piracy off the Horn of Africa." A48. The U.N. Security Council has likewise urged member States to act jointly to combat piracy off the Somali coast. See A33-A38.

The United States provides military support to the international community's counter-piracy operations, including operations conducted off the Horn of Africa through NATO's Operation Ocean Shield. Since 2009, Operation Ocean Shield has responded to the U.N. Security Council's "call on states and regional organizations to take active part in the fight against piracy off the coast of Somalia," and NATO member states provide a multinational force of warships and aircraft to patrol

and protect the waters off the Horn of Africa.[5] "Command and Control" over Operation Ocean Shield is "exercised by the NATO military chain of command, with the Supreme Allied Commander Europe having delegated operational command to Maritime Command Headquarters" in the United Kingdom.[6] "NATO Allies provide ships and maritime patrol aircraft to NATO Standing Maritime Groups, which in turn assigns a number of ships, on a rotational basis, to Ocean Shield."[7]

NATO's use of naval vessels to protect the seas from pirates continues a time-honored international tradition that persists to this day. "Pirates may, without doubt, be lawfully captured on the ocean by the public or private ships of every nation; for they are, in truth, the common enemies of all mankind * * *." *The Marianna Flora*, 24 U.S. 1, 43 (1825) (Story, J.) (addressing the actions of a U.S. "ship[] of war sailing * * * under the authority of the[] government, to arrest pirates"). See also *United States v. Dire*, 680 F.3d 446, 449 (4th Cir. 2012) (criminal appeal by Somali pirates who "imprudently launched an

---

[5] MARCOM Fact Sheet, Operation Ocean Shield, http:// www.mc. nato.int/about/Pages/Operation%20Ocean%20Shield.aspx (last visited July 29, 2014).

[6] *Ibid.*

[7] *Ibid.*

attack on the USS Nicholas, having confused that mighty Navy frigate for a vulnerable merchant ship").

**B. Facts and Prior Proceedings.**

In May 2011, the USS Groves, a U.S. warship assigned to Operation Ocean Shield, engaged pirates aboard the Jin Chun Tsai 68, a Taiwanese fishing vessel that had been commandeered by Somali pirates. A5, A63. In the course of the operation, the Jin Chun Tsai 68's master, a hostage of the pirates, was killed. A7. The Jin Chun Tsai 68 was sunk shortly thereafter, with Master Wu's body on board. *Ibid.*

**1.** The released (and unclassified) portion of the Navy's command investigation (an internal Navy investigation into the incident), see A63-A75, which was disclosed to plaintiff and to the Taiwanese authorities, describes the following basic, undisputed facts (which are relied upon in plaintiff's own complaint):[8]

- the USS Groves was transferred to NATO operational command on April 16, 2011 and assigned to NATO counter-piracy Task Force 508, see A63;

---

[8] As discussed below (in Argument Section I.B.ii), these fundamental facts are undisputed before this Court.

- while under NATO operational command, the Commanding Officer of the USS Groves kept U.S. military commanders from two destroyer squadrons "informed of his tasking and intended actions," A69;

- the NATO Task Force commander (Michiel B. Hijmans, a Commodore of the Royal Netherlands Navy) ordered the USS Groves to "disrupt the pirate mothership" Jin Chun Tsai 68, and planned the strategic and tactical outlines of the action with the commander of the USS Groves, A64;

- the NATO commander delegated authority to the USS Groves to engage the Jin Chun Tsai 68 under NATO Rules of Engagement, A64;

- the USS Groves "executed a graduated use of force" against the pirates, issuing warnings, firing warning shots, and finally firing at the Jin Chun Tsai 68 to disable the skiffs she carried on her bow and to force the pirates to surrender and release their hostages, A65;

- the crew of the USS Groves saw muzzle flashes from a return of fire by the pirates, A66;

11

- crewmembers from the USS Groves who boarded the Jin Chun Tsai 68 after the engagement found Master Wu's body, and also "2 RPG launchers with 12 RPG rounds, 18 AK-47s, and 2 heavier machine guns" with ammunition, A67;
- Commodore Hijmans ordered the USS Groves to sink the Jin Chun Tsai 68 with the master's body on board, A67.

**2**. Master Wu's widow filed this maritime tort action, alleging facts disclosed by the Navy's investigative report, and contending that they supported her claims of actionable negligence. The United States moved to dismiss the complaint because it would require the district court to adjudicate non-justiciable political questions. The district court held a hearing on the motion. See A76-A126 (transcript). After supplemental briefing, the court dismissed the complaint, agreeing with the United States that plaintiff's claims are not justiciable. See A127-A131.

The district court found that Master Wu's fishing vessel had been "hijacked by pirates" and its "crew members * * * held as hostages." A128. The USS Groves had engaged the pirates aboard the captured vessel while assigned to duties as "part of a NATO-led counter-piracy

12

operation" under the command of a "Royal Netherlands Navy Commodore." A128. During the operation, the "USS Groves was directed * * * to force the [Jin Chun Tsai 68] * * * to stop and surrender, using force if necessary." A128. "In accordance with an approved plan, the USS Groves employed a graduated use of force, including verbal warnings, and then rounds fired to disable the pirates' skiffs stowed on the Jin Chun Tsai 68's bow." *Ibid*.

The district court found that "the Commanding Officer of the USS Groves directed a cease fire" after firing warning shots towards the Jin Chun Tsai 68, "but the pirates fired back." A128. "The USS Groves responded by firing additional shots at the pirates' skiffs on the bow of the [Jin Chun Tsai 68]." *Ibid*. "After this exchange, the pirates surrendered." A128. Crewmembers from the USS Groves boarded the Jin Chun Tsai 68 and found that Master Wu had been killed. See *ibid*.

The Jin Chun Tsai 68 was sunk, with Master Wu's body aboard, "after the cessation of any confrontation with the pirates * * *." A129-A130. "The Navy sank the [Jin Chun Tsai 68] under direct orders from the allied commander of the NATO-led operation." A130.

Based upon these factual findings, the district court held that the political question doctrine prevented it from adjudicating plaintiff's claims. See A129. Applying the standards enunciated in *Baker v. Carr*, 369 U.S. 186, 217 (1962), "any one of which indicates a nonjusticiable political question," A127, the court held that plaintiff's action presents "[a] textually demonstrable constitutional commitment of the issue to a coordinated political department," *ibid.*, rather than to the courts.

The district court explained that "the executive branch of government, subject to review by the legislative branch of government," has sole constitutional authority to conduct the "belligerent operation[s]" of the United States' military forces. A129. Plaintiff's maritime tort case "would require this court to review the conducting of such an operation," and therefore, the court held, "the political question doctrine makes it nonjusticiable." A129. "The impossibility of a court's undertaking independent resolution" of the case "without expressing lack of the respect due coordinate branches of government" might also implicate the political question doctrine, the court determined. A128. And the court added that because "the acts upon which this law suit is

based were taken under a NATO operation," other *Baker v. Carr* factors might be relevant as well. A128 n.1.

The district court distinguished cases where "the negligence forming the basis for the suits arose from the operation of the vessel owned by the United States, not from an act of belligerency" during a military operation. A129 (distinguishing, *inter alia*, *Canadian Aviator v. United States*, 324 U.S. 215 (1945), and *Pacific-Atlantic S.S. Co. v. United States*, 175 F.2d 632 (4th Cir. 1949)). A129. And it concluded that historical prize cases were equally inapposite: "prize cases are *in rem* actions * * * over which admiralty courts have traditionally had jurisdiction," whereas plaintiff's action seeks damages from the United States. A129.

The district court noted that plaintiff's claims would in any event be barred by the discretionary function exception to the waiver of sovereign immunity under the Suits in Admiralty Act. A129 n.2. Citing *McMellon v. United States*, 387 F.3d 329, 349 (4th Cir. 2004) (en banc), the court acknowledged that the discretionary function exception to government liability applies in maritime tort cases, and it determined that "[c]learly, the firing and other actions undertaken by the USS

Groves constituted the exercise of discretion" by Navy personnel. A129 n.2.

The district court dismissed plaintiff's suit, and she has appealed. A131, A132.

## SUMMARY OF THE ARGUMENT

The judgment of the district court is correct: plaintiff's action raises non-justiciable political questions. Alternatively, plaintiff's claims cannot be litigated under the waiver of sovereign immunity in either the Suits in Admiralty Act or the Public Vessels Act, because both statutes incorporate an exception to liability for suits based upon the discretionary actions of government officials. This Court should therefore affirm the district court's judgment.

**1.** A claim is not justiciable if it presents questions that are properly for resolution by the political branches of government, rather than by the courts. Plaintiff here wants this Court to review and override the wisdom of strategic and tactical decisions made by military officers, from the United States and NATO, while they were engaged in an international counter-piracy task force action off the Horn of Africa. Those questions involve judgments made by naval officers in the midst

16

of a campaign against deadly pirates. The officers' judgments encompass both the proper weaponry and tactics to use in attacking a pirate ship, and dealing with foreign relations issues as the U.S. Navy operates in conjunction with navies of allied countries in overseas locations, protecting seamen and ships of nations from around the globe. Precisely these types of judgments are committed exclusively to the Executive Branch of government. The district court properly recognized this principle, and thus correctly declined to wade into the merits of plaintiff's claims that the USS Groves's engagement with the Jin Chun Tsai 68, under NATO's command, was negligent or unlawful.

Plaintiff's contentions in this Court fail to come to grips with the district court's reasoning and judgment. Plaintiff contends that the political question doctrine does not apply because the USS Groves did not undertake a "belligerent operation" — meaning an act of war — against the Jin Chun Tsai 68. But the political question doctrine bars claims based on acts across the spectrum of military activity, not just acts of war. In any event, the district court made clear that it chose the word "belligerent" not to denote a warlike act, but to convey that the USS Groves' engagement with the Somali pirates was part of an

17

international operation conducted with military assets. Plaintiff does not dispute those basic facts about the actions of the USS Groves.

Plaintiff is also mistaken in contending that the district court should have granted discovery before dismissing her case as non-justiciable. The district court made the basic findings needed to support its holding that it could not adjudicate plaintiff's claims — findings that the USS Groves was assigned to a NATO counter-piracy task force and acting under NATO orders during the encounter with the Jin Chun Tsai 68 — and plaintiff does not contend that those findings are clearly erroneous. Nor could she; the record before the district court, and especially the released portion of the Navy's investigative report that forms the basis of plaintiff's own allegations, confirm that the district court's basic understanding of the USS Groves's encounter with the Somali pirates aboard the Jin Chun Tsai 68 was accurate. Discovery would also have involved inquiries into sensitive military and foreign-relations concerns of the United States, and the district court did not err in refusing to go down that road.

Plaintiff is mistaken in contending that the Public Vessels Act, for historical reasons, provides an exception to the political question

doctrine for tort actions involving warships and other public vessels. The political question doctrine is grounded in the constitutional separation of powers principle and cases brought under the Public Vessels Act, like other federal cases, cannot be adjudicated if the questions they present are not suitable for judicial resolution. This case presents just such questions, and the district court was correct to dismiss it.

**2.** Plaintiff's suit is based upon the discretionary acts of U.S. and NATO military commanders, and for this reason as well, the district court did not err in dismissing it. Both the Suits in Admiralty Act and the Public Vessels Act incorporate a discretionary function exception to the waiver of the United States' sovereign immunity from maritime tort suits. Plaintiff's action alleges that the United States should be held liable for discretionary acts taken by military commanders, and for the USS Groves's decision to follow, rather than disobey, NATO orders. The United States can be held liable for neither type of decision.

This Court should affirm the district court's judgment dismissing plaintiff's action.

## STANDARD OF REVIEW

This Court reviews de novo the district court's dismissal of an action under Rule 12(b)(1). *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 762 (4th Cir. 2011). It reviews "a district court's jurisdictional findings of fact on any issues that are not intertwined with the facts central to the merits of the plaintiff's claims under the clearly erroneous standard of review * * *." *Ibid.* (quoting *United States ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347-48 (4th Cir. 2009)).

## ARGUMENT

I.  **PLAINTIFF'S CLAIMS ARE NOT JUSTICIABLE BECAUSE THEY PRESENT POLITICAL QUESTIONS.**

"A claim presents a political question when the responsibility for resolving it belongs to the legislative or executive branches rather than to the judiciary." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 334 (4th Cir. 2014) ("*Burn Pit Litig.*"). Thus, the fundamental "nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 210 (1962). The Supreme Court in *Baker v. Carr* identified "several formulations" that "may describe a political question," each with "one or more elements which identify it as" presenting matters unsuited for resolution by the federal courts. *Id.*

20

at 217. A "textually demonstrable constitutional commitment of the issue to a coordinate political department" may remove the dispute from the adjudicative authority of the courts. *Ibid.* Further, a court cannot proceed unless it can discern "judicially discoverable and manageable standards" for adjudicating the questions before it. *Ibid.*

Other indicia of a political question reflect a significant risk that judicial engagement in the parties' dispute might disrupt the relationship between coordinate branches of government. Although a federal court has the constitutional duty to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), it nonetheless cannot resolve any dispute that requires "an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217. Nor may a court resolve a dispute that would require it to "express[ a] lack of the respect due coordinate branches of government," or if the dispute arises under circumstances where there is an "unusual need for unquestioning adherence to a political decision already made" within a political branch. *Ibid.* Finally, "the potentiality of embarrassment from multifarious pronouncements by various

departments on one question" may preclude a court from issuing a judgment. *Ibid.*

In contexts involving actions by military officers these overarching separation-of-powers principles are vital because the Constitution commits responsibility for the military affairs of the United States to the political branches of government. "There is nothing timid or half-hearted about this constitutional allocation of authority." *Thomasson v. Perry*, 80 F.3d 915, 924 (4th Cir. 1996). Rather, the Constitution grants Congress "the enumerated powers to declare war, see U.S. Const. art. I, § 8, cl. 11; establish the armed forces, see *id*. cl. 12–13; and 'make Rules for the Government and Regulation of the land and naval Forces,' *id*. cl. 14." *Lebron v. Rumsfeld*, 670 F.3d 540, 549 (4th Cir. 2012). The Constitution makes a "parallel commitment of command responsibility in national security and military affairs to the President as Commander in Chief." *Ibid.* (citing U.S. Const. art. II, § 2, cl. 1.). Because of the clarity with which the Constitution charges Congress and the President with responsibility for military affairs, "[o]f the legion of governmental endeavors, perhaps the most clearly marked for judicial deference are

provisions for national security and defense." *Tiffany v. United States*, 931 F.2d 271, 277 (4th Cir. 1991).

Questions involving the foreign relations of the United States also "frequently turn on standards that defy judicial application, or involve the exercise of a discretion demonstrably committed to the executive or legislature * * *." *Baker*, 369 U.S. at 211. See *Yousuf v. Samantar*, 699 F.3d 763, 773 (4th Cir. 2012) (recognizing the Executive Branch's expertise in "customary international law and foreign policy" of the United States). In the foreign relations arena many questions also "uniquely demand single-voiced statement of the Government's views," and decisions made by the Executive should not, for that reason, be revisited by the courts. *Baker*, 369 U.S. at 211.

In determining whether an action presents a political question, a court must undertake a "discriminating inquiry into the precise facts and posture of the particular case," *Baker*, 369 U.S. at 217, to satisfy itself that "the duty asserted can be judicially identified and its breach judicially determined, and * * * protection for the right asserted can be judicially molded," *id*. at 198. The district court here undertook just such an inquiry, and determined that it could not adjudicate plaintiff's

tort action without intruding into military and foreign relations matters within the exclusive province of the Executive Branch of government. That determination was correct.

### A. The district court correctly held that plaintiff's complaint would require it to resolve military and foreign relations questions committed to the Executive Branch of government.

Plaintiff's complaint asks for tort damages, based upon the alleged negligence of crewmembers of the USS Groves in conducting an anti-piracy operation while the USS Groves was assigned to a NATO counter-piracy task force, operating off the Horn of Africa under the direct orders of a NATO commander, and battling Somali pirates to protect international shipping from further pirate attacks utilizing the Jin Chun Tsai 68. The specific acts of negligence plaintiff asserts involve strategic and tactical decisions made on the scene as the counter-piracy action unfolded. Plaintiff challenges decisions about the type of ordnance used during the action; about where the warship's weapons should have been aimed; about the range selected for the engagement; and about the USS Groves's decision to follow the NATO commander's direct order to sink the Jin Chun Tsai 68 with Master Wu's remains on board. See A9, A130, Br. 3-4. Plaintiff seeks

24

"[d]iscovery and evidentiary hearings" into matters such as "the actual authority and rationale" of the NATO commander — a Royal Netherlands Navy commodore — in determining that the Jin Chun Tsai 68 should be sunk, Br. 21, 29, and whether NATO's counter-piracy operations should accommodate "the property rights of shipowners" from various nations "dispossessed of their ships by pirates." Br. 21.

This Court has recognized that tactical and operational decisions of this sort are committed exclusively to the military commanders trained and empowered to make them, and they cannot later be reviewed through an action in federal court. See *Tiffany*, 931 F.2d at 277. Rather, "judicial review of military decisions would stray from the traditional subjects of judicial competence," *Lebron*, 670 F.3d at 548, and a tort action that would require a court to second-guess such decisions must be dismissed. See, *e.g.*, *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 412 (4th Cir. 2011) (claims against a military contractor were non-justiciable when the district court "would be obliged to evaluate military decisions" to resolve them); *Vulcan Materials Co. v. Massiah*, 645 F.3d 249, 266 (4th Cir. 2011) (noting the Supreme Court's concerns "with a civilian court sitting in judgment of

25

military decisions"). Plaintiff's action here seeks damages based upon alleged negligence by military commanders in making and executing operational decisions, and for that reason alone the district court did not err in dismissing it.

Plaintiff's action also plainly involves the foreign relations interests of the United States, sharpening the need for the courts to refrain from adjudicating plaintiff's claims. The USS Groves took the military actions alleged in plaintiff's suit as a member of a NATO counter-piracy task force under NATO command. As the Eleventh Circuit recognized in a similar factual context — there, a suit challenging the actions of a United States naval vessel engaged in NATO training exercises — the "relationship between the United States and its allies * * * is a matter of foreign policy" that is committed to the Executive Branch, rather than to the courts. *Aktepe v. United States*, 105 F.3d 1400, 1403 (11th Cir. 1997). The Eleventh Circuit explained that, because "courts are unschooled in 'the delicacies of diplomatic negotiation [and] the inevitable bargaining for the best solution of an international conflict,' the Constitution entrusts resolution of sensitive foreign policy issues to the political branches of

government." *Id.* at 1403 (citing *Smith v. Reagan*, 844 F.2d 195, 199 (4th Cir. 1988) (alteration in original; citation omitted)).

This suit challenges actions taken by a United States warship off the coast of Africa in its role as a member of a NATO military force authorized by the U.N. Security Council, engaged in preventing further use of the Jin Chun Tsai 68 by Somali pirates and protecting international shipping from further depredations by the pirates. It therefore presents a heightened need for the courts to refrain from challenging military decisions.

Furthermore, plaintiff's suit here, like the similar one in *Aktepe*, presents a non-justiciable political question under all of the examples described in *Baker*. See *Aktepe*, 105 F.3d at 1403 ("This suit exhibits most, if not all, of the indicia of political questions identified by the Supreme Court in *Baker v. Carr.*").

First, the action involves "'a textually demonstrable constitutional commitment of the issue to a coordinate political department,'" *Burn Pit Litig.,* 744 F.3d at 334 (quoting *Baker*, 369 U.S. at 217). The "Constitution delegates authority over military affairs to Congress and to the President as Commander in Chief, [and] contemplates no

27

comparable role for the judiciary." *Lebron,* 670 F.3d at 548; see generally *Baker*, 369 U.S. at 217. And the Constitution "entrusts resolution of sensitive foreign policy issues," including the United States' relationship with military allies engaged in an action overseas to protect the property and safety of citizens from around the globe, "to the political branches of government." *Aktepe*, 105 F.3d at 1403.

Second, "judicially discoverable and manageable standards" for adjudicating plaintiff's claims, *Baker*, 369 U.S. at 217, are absent here. As a general matter, "courts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." *Aktepe*, 105 F.3d at 1404. More specifically, "[n]ot only do courts lack the expertise to evaluate military tactics," but, as here, they may be "without knowledge of the facts or standards upon which military decisions have been based." *Tiffany*, 931 F.2d at 278.

This Court in *Tiffany* cited with approval a California district court's determination that "alleged negligence in [a] military action to free a captured vessel was nonjusticiable." 931 F.2d at 278 (citing *Rappenecker v. United States*, 509 F. Supp. 1024, 1029 (N.D. Cal.

28

1980)). The district court in *Rappenecker* had concluded, in an action factually similar to plaintiff's, that there were no standards against which it could judge "the reasonableness of the President's actions" in ordering military action against a captured vessel. 509 F. Supp. at 1029-1030.

Here, likewise, plaintiff's complaint raises claims of negligence that would require this Court to second-guess decisions made by U.S. and NATO commanders about the strategy and tactics chosen for a NATO counter-piracy operation off the coast of Africa, based upon the commanders' weighing of the risks and benefits to all parties that might be affected. The district court correctly held that it was not equipped to perform such a task.

The four remaining *Baker v. Carr* examples, each recognizing that a court's obligation to preserve appropriate relationships between coordinate branches of government may prevent it from adjudicating a claim, are also relevant here.[9]

---

[9] The remaining *Baker* examples of situations involving political questions are "(3) 'the impossibility of deciding [the issue] without an initial policy determination of a kind clearly for nonjudicial discretion,' (4) 'the impossibility of a court's undertaking independent resolution [of

*Continued on next page.*

Under the third *Baker* example, the "initial policy determination[s] of a kind clearly for nonjudicial discretion" include the United States' decision to assign the USS Groves to an international task force under NATO command, the command relationship between the USS Groves and the NATO commander, and NATO's decision to order the USS Groves to engage, and later sink, the Jin Chun Tsai 68. *Baker*, 369 U.S. at 217. See *Aktepe*, 105 F.3d at 1404 (Plaintiff's action based upon a NATO training exercise "inevitably would require that courts make initial policy decisions of a kind appropriately reserved for military discretion."). And as in *Aktepe*, the fourth *Baker* factor applies because adjudicating plaintiff's challenges to the strategic and tactical decisions made by NATO and the USS Groves would "express[ a] lack of the respect due" the U.S. and allied commanders responsible for the operation, *Baker*, 369 U.S. at 217. As the court in *Aktepe* explained, that lack of respect is shown by subjecting "discretionary military and

---

the issue] without expressing lack of the respect due coordinate branches of government,' (5) an 'unusual need for unquestioning adherence to a political decision already made,' or (6) 'the potentiality of embarrassment from multifarious pronouncements by various departments on one question.'" *Burn Pit Litig.*, 744 F.3d at 334 (quoting *Baker*, 369 U.S. at 217) (alterations in original; emphasis omitted).

foreign policy decisions to judicial scrutiny, notwithstanding the judiciary's relative lack of expertise in these areas," 105 F.3d at 1404.

The fifth *Baker* factor is relevant because the facts here show an "unusual need for unquestioning adherence to [] political decision[s] already made" by Executive branch officials in military and diplomatic arenas. *Baker*, 369 U.S. at 217. The USS Groves was acting under NATO orders, in a manner designed to carry out international agreements governing the United States' co-operation with its allies in international military counter-piracy operations, when it engaged the pirates aboard the Jin Chun Tsai 68 and carried out the NATO order with respect to the disposition of that vessel. For the same reasons, the "potentiality of embarrassment from multifarious pronouncements by various departments on one question" (the sixth and last *Baker* factor) is exceptionally great in this setting, where the district court is being asked to adjudicate whether a military operation under NATO command, undertaken in furtherance of international agreements, was actionably negligent or unlawful. *Ibid.*

A case presents a political question if just one of the *Baker* examples accurately describes it. See *Tiffany*, 931 F.2d at 276. Here,

31

where all six formulations are relevant, the district court correctly dismissed the action as non-justiciable.

### B. Plaintiff is mistaken in contending that her suit could be adjudicated without violating separation-of-powers principles.

Plaintiff has no real answer to the district court's determination that decisions involving the strategic conduct of military operations are committed to the Executive Branch, and she distinguishes this Court's cases, and relevant cases from other jurisdictions, on their facts. See Br. 22-23. Plaintiff contends primarily that because no "belligerency" occurred, the political question doctrine does not apply here. See Br. 14-15, 18-21. She also argues that the district court's dismissal of her case, without discovery and an evidentiary hearing, was premature, see Br. 17, 20, 21, and that the Public Vessels Act authorizes this suit, see Br. 23-30, 37-40.

None of plaintiff's contentions is persuasive.

### i. The political question doctrine bars this suit regardless of whether any act of "belligerency" was involved, because the suit arises from action by a U.S. Navy warship under the command of a Royal Netherlands Navy commodore as part of a NATO task force.

Plaintiff contends that the district court erred in describing the USS Groves's operation against the pirates as a "belligerent operation," because no act of war is at issue in this case. Br. 17-19. In plaintiff's view, the district court should have adjudicated her tort suit because her claims challenge action "no different than a police officer stopping of a vehicle on any highway." Br. 19.

For purposes of the political question doctrine, the actions of a United States warship, under orders from NATO during an international counter-piracy operation off the coast of Somalia, could hardly be more different from a domestic traffic stop. The district court correctly recognized that plaintiff's suit would require it to determine whether decisions made by United States and NATO commanders were actionable, and that it lacked the tools necessary to make those judgments.

Moreover, plaintiff's objection to the district court's choice of the word "belligerency" is misplaced because a broad range of actions

33

undertaken by military forces, besides "belligerent" acts in the law-of-war sense, fall under the political question doctrine. This Court has explained that "[t]he elementary canons of judicial caution are not limited to actions taken during actual wartime, but may extend to many other aspects of military operations." *Tiffany*, 931 F.2d at 278. The Supreme Court has declined to review matters as far removed from the battlefield as the choice of a design for a military helicopter, see *Boyle v. United Techs. Corp.*, 487 U.S. 500, 511 (1988), and the Eleventh Circuit has determined that actions arising from military training operations can present non-justiciable questions, see *Aktepe*, 105 F.3d at 1401-1402. Plaintiff is therefore mistaken in assuming, see Br. 18, that the district court's ruling can be sustained only if the USS Groves committed a "belligerent" act under the law of war.

In any event, plaintiff reads too much into the district court's use of the word "belligerent." The district court at the motions hearing explained that it chose to describe the action of the USS Groves against the Somali pirates as "an act of belligerence" only "for shorthand," and in *contradistinction to* an "act of war," because, the court explained, "act of war" "raises all kinds of legal questions; what's an act of war?" A86.

34

The critical point is that plaintiff's suit challenges an engagement by a United States military vessel acting under military orders. The district court applied the political question doctrine not because it believed the United States to be at war, but because "the USS Groves was part of a NATO-led counter-piracy operation whose commander was a Royal Netherlands Navy Commodore," when it encountered the Jin Chun Tsai 68. A128. The district court thus correctly recognized that decisions about how to conduct an authorized action using international military assets are committed exclusively to the responsible military forces, regardless of the legal characteristics of the underlying operation.[10]

---

[10] Although this Court need not address whether the USS Groves's action was a "belligerency" under the law of war, the United States agrees with the district court and with plaintiff that the USS Groves's action against the Jin Chun Tsai 68 was not "belligerent" in the specialized law-of-war sense. Operations against the Somali pirates are carried out by an international military force to provide maritime security for all nations, by repressing piracy "off the Horn of Africa in the interest of the global economy, freedom of navigation, Somalia, and the regional states." U.S. Nat'l Sec. Council, *Countering Piracy off the Horn of Africa* 6, available at: http://www.marad.dot.gov/documents/ Countering_Piracy_Off_The_Horn_of_Africa_Partnership__Action_ Plan.pdf (last visited July 31, 2014).

Plaintiff misinterprets the district court's point that cases decided in the 1940s under the Public Vessels Act are distinguishable because they "arose from the operation of the vessel owned by the United States, not from an act of belligerency." Br. 23 (quoting A129). Although plaintiff hypothesizes that the district court suggested in this language that the Public Vessels Act authorizes suit for "errors of navigation to the exclusion of other forms of negligence," *ibid.*, the district court engaged in no such reasoning; it simply pointed out (correctly) that none of the cases from the 1940s involved a suit based upon an engagement under military orders with another vessel, and that the cases therefore did not raise the justiciability concerns at issue here. See A129.

Nor is there merit to plaintiff's view that her claims relating to the sinking of the Jin Chun Tsai 68 should be treated differently from her claims related to the exchange of fire between the USS Groves and the pirates. According to plaintiff, the sinking of the vessel "was totally removed from any element of conflict" between the USS Groves and the pirates, Br. 20, and the district court should therefore have adjudicated at least her claims for the loss of the Jin Chun Tsai 68. But the district

court found that "[t]he Navy sank the [Jin Chun Tsai 68] under direct orders from the allied commander of the NATO-led operation." A130. And as the court correctly held, the military and foreign policy dimensions of that single fact bring plaintiff's claims based upon the disposition of the Jin Chun Tsai 68 squarely within the political question doctrine. See A130.

Because the sinking of the Jin Chun Tsai 68 was an integral part of the NATO task force's encounter with the pirates, plaintiff's view that the disposition of the Jin Chun Tsai 68 should have been effectuated by a court, see Br. 32-36, is mistaken. The Jin Chun Tsai 68 was not "captured" by the USS Groves; rather, it was removed from the hands of the pirates and then sunk. "Capture" is a technical admiralty term related to the law of prize: a vessel is "captured" if her captors indicate "an intention to seize and to retain as prize * * *." *The Grotius*, 13 U.S. (9 Cranch.) 368, 370 (1815). A prize is a vessel captured "in time of war." *Cushing v. Laird*, 107 U.S. 69, 77 (1883); see also *The Siren*, 80 U.S. (13 Wall.) 389, 391-393 (1871) (discussing the English origins of the American law of prize); 10 U.S.C. § 7651 *et seq.* (prize statute). See also 3 Op. Att'y Gen. 377, 378 (1838) (pointing out the

37

legal novelty of a capture made by the French squadron that was blockading New Orleans as a "peaceful measure," rather than a capture made by an "ordinary blockade[] in time of war."). Here, all agree that the engagement between the NATO counter-piracy task force and the Somali pirates was not an act of war. As a consequence, the Jin Chun Tsai 68 was not captured, and did not need to be disposed of, under the law of prize.

Plaintiff is likewise mistaken in categorizing the USS Groves's engagement with the Jin Chun Tsai 68 as a "Good Samaritan" action, or a "rescue operation" analogous to the rescue by the U.S. Coast Guard of distressed mariners. Br. 25 and n.5. The focus of the USS Groves's operation was to stop the depredations of the pirates, in part by depriving the pirates of their stolen mother ship. Sinking the Jin Chun Tsai 68 was part of the course of action worked out by the military commanders to further maritime security. The district court correctly recognized that because the Jin Chun Tsai 68 was sunk under direct NATO orders, the court could not adjudicate plaintiff's claim that the decision to sink the vessel was negligent or unlawful.

### ii. The district court correctly granted the government's Rule 12(b)(1) motion to dismiss plaintiff's tort suit without ordering discovery into NATO's ongoing counter-piracy operations.

Plaintiff contends that the district court should have ordered "discovery and an evidentiary hearing" into the facts surrounding the USS Groves's engagement with the Jin Chun Tsai 68 before determining that her suit was non-justiciable. Br. 8. But the district court made sufficient findings of fact to support its ruling granting the United States' motion to dismiss, and plaintiff does not contend that the district court's factual findings are clearly erroneous. The district court therefore did not err when it foreclosed discovery into sensitive matters pertaining to military and foreign relations affairs of the United States.

The district court made the factual findings necessary to support its holding that plaintiff's action is not justiciable. The court was entitled to make factual findings based on the record on the motion to dismiss. See *Al Shimari v. CACI Premier Tech., Inc.,* ___ F.3d ___, 2014 WL 2922840, at *13 (4th Cir. June 30, 2014). The court found that the USS Groves, acting under NATO command, was involved in an operation against the Somali pirates aboard the Jin Chun Tsai 68. See

A128. To the extent that the allegations in plaintiff's complaint were consistent with the facts determined through the Navy's investigation, the court accepted plaintiff's allegations as true for purposes of ruling on the United States' motion to dismiss. See *ibid.*

Plaintiff does not contend that the district court's findings of fact are clearly erroneous. See, *e.g.*, Br. 19 (making arguments premised upon the truth of the district court's findings). Plaintiff asserts that the district court "clearly err[ed]" in using the word "belligerent," Br. 1, but as discussed above (*supra* pp. 32-35), plaintiff's arguments on this point are misplaced.

Plaintiff also alleges that there are factual disputes about matters that go beyond the basic history of the USS Groves's engagement with the pirates, such as whether "the NATO command" to sink the Jin Chun Tsai 68 "could override international or U.S. law" and whether the USS Groves "had a duty to assess alternatives" to compliance with that command from NATO. Br. 8. But these types of issues, as the district court held, are not justiciable. For purposes of finding the basic facts, the district court, like plaintiff, looked primarily to the released Navy report, and plaintiff does not challenge the credibility or accuracy

of the basic facts found by the Navy investigators. See A128 (district court's findings crediting A63); A95, A104 (discussion of the command of the USS Groves); A8; Br. 4-6 (plaintiff's factual allegations, citing the report).

In resolving the single material discrepancy between plaintiff's factual allegations and the report, the court did not clearly err in finding that the USS Groves was under NATO's operational command during the engagement, rather than under the command and control of the U.S. Navy. Compare A128 (district court's finding that "the USS Groves was part of a NATO-led counter-piracy operation"), with A6 (plaintiff's complaint, alleging that "the US Navy chain of command maintained control of" the USS Groves "at all times,") and Br. 4 (citing the complaint)). Plaintiff in any event does not dispute the district court's finding that the USS Groves operated under NATO command. See, *e.g.*, Br. 8 (describing the command to sink the Jin Chun Tsai 68 as a "NATO command").[11]

---

[11] The investigation report reveals a multi-faceted situation with respect to the international and national chains of command. When the United States assigned the USS Groves to a NATO task force it did not withdraw the ship from the U.S. Navy's command structure; the USS

*Continued on next page.*

Plaintiff contends, however, that the district court acted prematurely in dismissing her action before ordering discovery. See Br. 8, 17-18, 20. Although a district court should resolve factual disputes affecting its power to hear a case "'only after appropriate discovery'" if facts relevant to justiciability "'are inextricably intertwined with those central to the merits'" of the action, *Burn Pit Litig.*, 744 F.3d at 334 (quoting *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009)), this is not such a case. The district court declined to adjudicate plaintiff's challenges to decisions made by U.S. Navy and NATO commanders because it found that the USS Groves engaged and sank the Jin Chun Tsai 68 in the course of its duties as a member of a NATO task force

---

Groves remained part of the U.S. Navy and the President could recall the ship to national service at any time if a military contingency so required.  The Navy's command investigation found some confusion in this specific case about which geographic unified U.S. command was responsible for the USS Groves after NATO transferred the ship from one Standing NATO Maritime Group of vessels to a different group.  See A70.  But the details of the national chain of command had no bearing on the USS Groves's action against the Somali pirates.  As the district court found, the USS Groves was under NATO's *operational* command as part of NATO counter-piracy Task Force 508.  See A128.  The commanding officer of the USS Groves complied with his obligations to the Navy by keeping what he believed to be his U.S. national chain of command "informed of his tasking and intended actions."  A69.

under NATO command. These fundamental findings, which plaintiff does not contend are clearly erroneous, are in fact accurate. They amply support the district court's ruling and no additional fact-finding is needed.

The separation-of-powers concerns that underlie the political question doctrine, moreover, weigh heavily against discovery here. Plaintiff seeks discovery into sensitive military and foreign relations questions, such as: whether the NATO "naval commander complied with the rules of engagement" applicable to Operation Ocean Shield, an ongoing NATO counter-piracy operation, Br. 8; whether the NATO commander's order to sink the Jin Chun Tsai 68 was consistent with "U.S. law and Navy doctrine," *ibid.*; and whether the NATO commander should have sought out Taiwanese "salvors, insurers or flag state interests" to assume control of the Jin Chun Tsai 68, rather than sinking it, Br. 21. But court-authorized inquiries into the United States' relations with its military allies during an international counter-piracy operation would raise separation-of-powers concerns of the highest order. Judicial inquiry into U.S. military affairs is sensitive in and of itself; actions may be barred when they present "the 'type[s] of claims

43

that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'" *United States v. Johnson*, 481 U.S. 681, 690 (1987) (quoting *United States v. Shearer*, 473 U.S. 52, 59 (1985)). See *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673 (1977) (foreclosing claim where "trial would * * * involve second-guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions"); *Massiah*, 645 F.3d at 266 (foreclosing claim that would "result[] in numerous Navy witnesses being called into court to testify 'about their own actions and those of fellow servicemen'") (quoting the trial record).

Plaintiff suggests at another point in her brief that instead of obeying the order of the NATO commander to sink the Jin Chun Tsai 68, the USS Groves should have escorted the vessel to the United States for a court action to determine how to dispose of it. See Br. 33-34 & n.9. As the district court pointed out, however, in this scenario the USS Groves would have had to travel "thousands of nautical miles away from the counter-piracy theater, thus reducing the assets available to" NATO's counter-piracy force in the Indian Ocean. A130.

44

Regardless of plaintiff's specific articulation of her claims, discovery and trial in this case would probe the command structure, rules of engagement and tactical and strategic decision-making not only of the U.S. Navy, but also of allied NATO forces, all at the direction of a federal court. The district court had all the facts it needed to hold that plaintiff's claims are non-justiciable, and it did not err in foreclosing discovery that would raise such grave constitutional concerns.

### iii. *The political question doctrine applies to suits under the Public Vessels Act.*

The Public Vessels Act provides that a "civil action in personam in admiralty may be brought, or an impleader filed, against the United States for * * * damages caused by a public vessel of the United States," 46 U.S.C. § 31102. Citing the enactment history of the Public Vessels Act and cases decided in the 1940s, Br. 26, 30, 37-40, plaintiff contends that this statutory waiver of sovereign immunity for torts committed by public vessels such as warships "must prevail over the general presumption against review of military decisions" recognized in the first *Baker* formulation of the political question doctrine. Br. 39.

Plaintiff's legal analysis is incorrect. The Supreme Court in *Baker* clarified separation-of-powers principles that apply, as a matter of

45

structural constitutional law, to all cases brought in federal court. Congress must exercise its authority consistently with the constitutional separation of powers. See, *e.g. INS v. Chadha*, 462 U.S. 919, 951 (1983). Contrary to plaintiff's apparent view, therefore, Congress cannot legislatively set aside a category of cases that are not subject to separation-of-powers principles, either explicitly, or implicitly by providing a waiver of the United States' sovereign immunity from maritime tort claims.

## II.  THE STATUTORY WAIVERS OF SOVEREIGN IMMUNITY IN THE SUITS IN ADMIRALTY ACT AND THE PUBLIC VESSELS ACT DO NOT EXTEND TO ACTIONS BASED UPON DISCRETIONARY GOVERNMENTAL ACTS, AND THE DISCRETIONARY FUNCTION EXCEPTION THEREFORE BARS PLAINTIFF'S SUIT.

The district court determined that plaintiff's maritime damages action would be "futile" in any event, in light of this Court's holding that "the 'discretionary function' exception to the Federal Tort Claims Act [FTCA] applies to actions brought under the Suits [in] Admiralty Act." A129 n.2 (citing *McMellon v. United States*, 387 F.3d 329, 349 (4th Cir. 2004) (en banc)). "Clearly," the district court stated, "the firing and other actions undertaken by the USS Groves constituted the exercise of discretion" and plaintiff's suit is accordingly barred. A129 n.2.

46

The district court's reasoning and conclusion are correct. This Court in *McMellon* recognized that "the discretionary function exception contained in the FTCA is grounded in separation-of-powers concerns," and it "'articulate[s] a policy of preventing tort actions from becoming a vehicle for judicial interference with decisionmaking that is properly exercised by other branches of government.'" 387 F.3d at 341, 343 (citation omitted; brackets in original). This Court concluded that, although the Suits in Admiralty Act contains no *express* discretionary function exception, it nonetheless does not waive the government's immunity from maritime tort claims based upon the discretionary acts of government officials.

Plaintiff's action is barred under *McMellon*, as the district court here correctly observed. Within the broad parameters of the course of action arranged between the NATO and U.S. Navy commanders, NATO delegated to the USS Groves the discretion to determine how best to carry out the action against the pirates. See A64. Other actions were carried out under direct orders from NATO. See A67, A130 (NATO order to sink the Jin Chun Tsai 68). The United States cannot be held liable for its discretionary acts. *McMellon*, 387 F.3d at 342. Nor can it

47

be held liable in tort for *complying with* NATO orders (even assuming, *arguendo*, that a NATO military order could be a legal obligation that could render action by the United States non-discretionary). See *United States v. Gaubert*, 499 U.S. 315, 324 (1991) ("if a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected" from an action in tort). Plaintiff does not allege that the USS Groves failed to comply with any order from NATO, and her suit is barred.

Plaintiff contends that the Public Vessels Act does not include a discretionary function exception although the Suits in Admiralty Act does. See Br. 31. But this Court in *McMellon* made clear that the discretionary function exception must be implied into maritime immunity waivers as a matter of constitutional law. See 387 F.3d at 341-42. This Court discussed both the Public Vessels Act and the Suits in Admiralty Act in explaining its reasoning, because its separation-of-powers rationale applies equally to both statutory waivers of sovereign immunity from maritime tort suits. See, *e.g.*, *id.* at 344-48. This Court even pointed out that "cases involving public or merchant vessels are *more* likely" than other admiralty cases "to involve the executive's

48

discretionary functions into which the judiciary should not intrude." *Id.* at 347 (emphasis added). This case is a good example of why that statement is correct. And as plaintiff herself acknowledges, Br. 40 n.14, the other courts of appeals to address the issue have unanimously held that the waiver of sovereign immunity in the Public Vessels Act is subject to a discretionary function exception. See generally *Tobar v. United States*, 731 F.3d 938, 945 (9th Cir. 2013) (collecting cases); Thomas J. Schoenbaum, 2 *Admiralty and Maritime Law*, 490-91 (3d ed. 2001).

Plaintiff also contends that the discretionary function exception does not apply to her suit because, in her view, the "destruction" of the Jin Chun Tsai 68 was "contrary to law" and fell outside the discretion the United States could properly exercise. Br. 31. But plaintiff is mistaken for two reasons. First, the United States generally cannot be held liable in tort for its discretionary acts "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

Second, plaintiff is mistaken in suggesting that international conventions and treaties are sources of law that would allow her to sue the United States because a ship assigned to a NATO task force

49

followed a NATO order. See Br. 32-36. These international instruments do not establish a rule of law for civil litigation. A non-self-executing treaty "addresses itself to the political, not the judicial department; and the legislature must execute the [treaty] before it can become a rule for the Court." *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.). See *Medellin v. Texas*, 552 U.S. 491, 505-06 (2008); *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992) ("International treaties are not presumed to create rights that are privately enforceable."). Plaintiff points to no statute implementing the provisions of any international agreement that might have provided a rule of law for the district court to apply, let alone a rule that would have obliged the USS Groves to disobey the NATO order to sink the Jin Chun Tsai 68 and instead transport the vessel to the United States for an "adjudication," Br. 21.

The district court correctly held that the USS Groves was either acting within its discretion or following NATO orders throughout the relevant counter-piracy operation. This Court should affirm the district court's judgment because the United States has not waived its sovereign immunity from this maritime tort suit.

50

# CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted,

STUART F. DELERY
   *Assistant Attorney General*

ROD J. ROSENSTEIN
   *United States Attorney*

DOUGLAS N. LETTER
ANNE MURPHY
   *(202) 514-3688*
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7644*
   *U.S. Department of Justice*
   *950 Pennsylvania Ave., N.W.*
   *Washington, D.C.  20530*

AUGUST 2014

51

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

I hereby certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,650 words, according to the count of Microsoft Word.

s/Anne Murphy
Anne Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2014, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Eight paper copies will be deposited in the overnight mail on Monday, August 4.

The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

s/Anne Murphy
Anne Murphy